899 F.2d 1389
 54 Fair Empl.Prac.Cas. 501,
29 Wage & Hour Cas. (BN 1209,
53 Empl. Prac. Dec. P 39,791, 58 USLW 2616,
114 Lab.Cas. P 35,336, 59 Ed. Law Rep. 669
 Elizabeth DOLE, Secretary, United States Department of
Labor; Equal Employment Opportunity Commission,
Plaintiffs-Appellees,
v.
SHENANDOAH BAPTIST CHURCH; Carol C. Anderson; Lola D.
Clifton; Loretta B. Dillon; Dorothy M. Dixon; Alma S.
Greene; Delilah F. Gross; Margaret Harvey; Mary Ann
Herndon; Jeffrey P. Kessler; John T. Kessler; Shirley I.
Kessler; Joyce T. Martin; Eva T. Murdock; Sherry R.
Padgett; Antoinette L. Parsons; Barbara C. Shelor; Donna
Shelor; Mary Beth Shelor; Ann T. Shelton; Ruth Wesselink;
Donna M. Womack, Defendants-Appellants.
Elizabeth DOLE, Secretary, United States Department of
Labor; Equal Employment Opportunity Commission,
Plaintiffs-Appellants,
v.
SHENANDOAH BAPTIST CHURCH; Carol C. Anderson; Lola D.
Clifton; Loretta B. Dillon; Dorothy M. Dixon; Alma S.
Greene; Delilah F. Gross; Margaret Harvey; Mary Ann
Herndon; Jeffrey P. Kessler; John T. Kessler; Shirley I.
Kessler; Joyce T. Martin; Eva T. Murdock; Sherry R.
Padgett; Antoinette L. Parsons; Barbara C. Shelor; Donna
Shelor; Mary Beth Shelor; Ann T. Shelton; Ruth Wesselink;
Donna M. Womack, Defendants-Appellees.
 Nos. 89-2341, 89-2369.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1990.
Decided March 30, 1990.
As Amended April 5, 1990.
 
 Donald W. Lemons, Durrette, Irvin & Lemons, P.C., Richmond, Va., Donald Wise Huffman, Bird, Kinder & Huffman, Roanoke, Va. (John L. Cooley, Fox, Wooten & Hart, P.C., Roanoke, Va., on brief), for defendants-appellants.
 Samuel Alan Marcosson, U.S. E.E.O.C., William J. Stone, U.S. Dept. of Labor, Washington, D.C. (Charles A. Shanor, General Counsel, Gwendolyn Young Reams, Associate General Counsel, U.S. E.E.O.C., Jerry G. Thorn, Acting Solicitor, Monica Gallagher, Associate Solicitor, Linda Jan S. Pack, Counsel for Appellate Litigation, U.S. Dept. of Labor, Washington, D.C., on brief), for defendants-appellees.
 Before SPROUSE and CHAPMAN, Circuit Judges, and HOFFMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 SPROUSE, Circuit Judge:
 
 
 1
 The dispute underlying this appeal arose when the federal government sought to apply certain provisions of the Fair Labor Standards Act (the Act or the FLSA)[1] to the Roanoke Valley Christian Schools (Roanoke Valley) operated by Shenandoah Baptist Church. The church and twenty-one intervening employees (Shenandoah) urge that the district court erred in awarding back pay for teachers (for equal pay violations) and for nonprofessional support staff (for minimum wage violations). Shenandoah asserts that Roanoke Valley is not covered by the FLSA; that application of the Act violates the free exercise and establishment clauses of the first amendment and the equal protection guarantee of the fifth amendment; and that, even if the Act does apply, the damages were improperly calculated. The government cross-appeals, contending that the trial court abused its discretion in declining to award prejudgment interest and in refusing to grant injunctive relief. We affirm the decision of the district court in all respects.
 
 I. Facts
 
 2
 The Shenandoah Baptist Church was founded in 1971 as an independent Baptist church which trusts in the absolute authority of the Bible. Shenandoah asserts, and the government has not disputed, that the church views Christian education as a vital part of its mission. Shenandoah believes the "Great Commission" of Matthew 28:19-20 requires the church to evangelize, baptize, and teach:
 
 
 3
 Go ye, therefore, and teach all nations, baptizing them in the name of the Father, and of the Son, and of the Holy Ghost, teaching them to observe all things whatsoever I have commanded you and, lo, I am with you always even unto the end of the world.
 
 
 4
 Shenandoah opened Roanoke Valley in 1973, with a full-time curriculum that included instruction in Bible study and in traditional academic subjects into which biblical material had been integrated. The school gradually expanded until, by 1977, it offered classes from kindergarten through high school. The teaching staff expanded accordingly, from twenty to about thirty teachers between 1976 and 1986, the years at issue in this case.
 
 
 5
 Roanoke Valley teachers received base salaries of about $6000 for the 1976 school year. Because this low salary level made it difficult to attract teachers, Shenandoah instituted a head-of-household salary supplement. Pastor Robert L. Alderman explained the basis for the supplement in this way:
 
 
 6
 When we turned to the Scriptures to determine head of household, by scriptural basis, we found that the Bible clearly teaches that the husband is the head of the house, head of the wife, head of the family.... We moved in that direction, thinking that our opportunity and responsibility of basing our practice on clear biblical teaching would not be a matter of question.
 
 
 7
 The supplement ranged from $1600 in the 1976-77 school year to $200 during the 1985-86 school year. By that time, base salaries had been increased to about $12,500, and the supplement was discontinued.
 
 
 8
 Between 1976 and 1986, all married male teachers received a salary supplement. Married women were not eligible to receive the supplement. It was not paid to a woman whose husband was a full-time graduate student, nor to a woman who raised two children on her teaching income after her husband, who had become disabled and mentally ill, left the family. Another mother of two who was separated from her husband was not paid the supplement for two years until her divorce became final. Between 1981 and 1986, three divorced female teachers who had dependents did receive the supplement. No woman received a supplement prior to 1981.
 
 
 9
 Also, between 1976 and 1982, ninety-one persons who worked at Roanoke Valley as support personnel were paid less than the hourly minimum wage. These workers included bus drivers, custodians, kitchen workers, bookkeepers, and secretaries.
 
 II. Procedure
 
 10
 In 1978, the government brought this action,[2] alleging that Shenandoah had violated two aspects of the Fair Labor Standards Act. The government asserted that Shenandoah had paid Roanoke Valley support personnel less than the minimum wage and had paid female teachers less than male teachers performing the same job. 29 U.S.C. Secs. 206(a) and (d).[3] The complaint sought permanent injunctive relief and back pay with interest. The parties stipulated to many of the key facts. Shenandoah acknowledged that, between 1976 and 1982, support personnel were paid less than the statutory minimum wage. Shenandoah also conceded that, between 1976 and 1986, most full-time female teachers at Roanoke Valley were paid less than most full-time male teachers, although their "skill, effort, responsibility and working conditions" were "substantially equal." But Shenandoah asserted that the school was not covered by the FLSA and that applying the statute to a church-run school like Roanoke Valley would be unconstitutional.
 
 
 11
 In 1983, the district court entered partial summary judgment in favor of the government on the minimum wage claim.[4] Donovan v. Shenandoah Baptist Church, 573 F.Supp. 320 (W.D.Va.1983) (Shenandoah I ). The court concluded that Congress intended the Act to apply to church-run schools, that Shenandoah's nonprofessional support staff was not exempt from the statute's coverage, unlike members of recognized "religious orders," and that requiring Shenandoah to comply with the statute's minimum wage provisions would not violate the church's first amendment rights. Twenty-one of the nonprofessional staff members subsequently intervened to assert their own first amendment rights and to support Shenandoah's position.
 
 
 12
 The case was tried to the district court and a seven-member advisory jury in September 1988. Based on its holding in Shenandoah I and on the parties' stipulations, the court found that Shenandoah had violated the FLSA minimum wage requirement. The court ruled that the equal pay provisions of the Fair Labor Standards Act also apply to Roanoke Valley and then posed two questions to the advisory jury. The panel found "that the female school teachers ... were paid less than the male teachers who were performing equal work" and that the salary differential was "not based on a factor other than sex." The district court adopted these findings in its subsequent opinion and rejected arguments by Shenandoah and the intervenors that application of the FLSA infringed their first and fifth amendment rights. Department of Labor v. Shenandoah Baptist Church, 707 F.Supp. 1450 (W.D.Va.1989) (Shenandoah II ).
 
 
 13
 The trial court ordered Shenandoah to pay the government $16,818.46 in back pay to be distributed to the support staff members who were the subject of the minimum wage claim and $177,680 to be distributed to the teachers who were the subject of the equal pay claim. The court declined to award prejudgment interest. The court also refused to enjoin Shenandoah from violating the Act in the future or from soliciting employees for the return of back pay awards.
 
 
 14
 Both Shenandoah and the government appeal. Shenandoah urges that Roanoke Valley is not covered by the Fair Labor Standards Act. It insists that applying the Act here violates the free exercise and establishment clauses of the first amendment and the equal protection guarantee of the fifth amendment. Shenandoah also argues that the district court erred in its damage calculations by awarding back pay to single female teachers and by awarding back pay to support staff members without regard to whether their work was church-related or school-related. The government argues that the district court abused its discretion in refusing to award prejudgment interest on the back pay awards and in failing to grant injunctive relief.[5] We address these contentions seriatim.
 
 
 15
 III. Applicability of the Fair Labor Standards Act
 
 
 16
 Shenandoah urges that the strictures of the Fair Labor Standards Act do not apply to Roanoke Valley. We disagree. Two conditions are necessary for the FLSA to apply. The first is that Roanoke Valley be an "enterprise" within the definition of the Act; the second is that the teachers and support staff be "employees." See 29 U.S.C. Secs. 203(r) & (e); Tony & Susan Alamo Found. v. Secretary of Labor, 471 U.S. 290, 295, 105 S.Ct. 1953, 1958, 85 L.Ed.2d 278 (1985). We begin with the question of enterprise.
 
 
 17
 When the FLSA was amended in 1961 to cover enterprises as well as individuals, nonprofit religious and educational organizations were exempt, provided they were not engaging in ordinary commercial activities. See Alamo, 471 U.S. at 297-98, 105 S.Ct. at 1959.[6] However, Congress amended the statute again in 1966 to include public and private schools in the definition of enterprise. The amended statute explicitly states that nonprofit schools are within the scope of the Act:
 
 
 18
 "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units.... For purposes of this subsection, the activities performed by any person or persons--
 
 
 19
 (1) in connection with the operation of ... a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such ... school is public or private or operated for profit or not for profit)....
 
 
 20
 ....
 
 
 21
 shall be deemed to be activities performed for a business purpose.
 
 
 22
 29 U.S.C. Sec. 203(r); see also 29 U.S.C. Sec. 203(s)(5).
 
 
 23
 Shenandoah urges that this amendment does not demonstrate a clear "affirmative intention" by Congress that the Act apply to church-operated schools. NLRB v. Catholic Bishop, 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979).[7] However, an examination of the legislative history of the amendment belies that argument. The provision as originally presented to the House would have covered institutions of higher learning but not elementary and secondary schools. Congressman Collier proposed the language adding public and private elementary and secondary schools. During debate, the following exchange took place:
 
 
 24
 Mr. PUCINSKI. Let us consider a parochial elementary school, in which the nuns do the work in the cafeteria. Would they have to be paid a minimum wage?
 
 
 25
 Mr. COLLIER. No, they would not be covered.
 
 
 26
 Mr. BURTON of California. Mr. Chairman, will the gentleman yield?
 
 
 27
 Mr. COLLIER. I am delighted to yield to the gentleman from California.
 
 
 28
 Mr. BURTON of California. As I understand, it is not the gentleman's intention to include members of a religious order under the definition of an employee, and therefore a nun would not be considered an employee. Therefore, a minimum wage would not be required to be paid a nun. Am I correct in my understanding of the gentleman's intention?
 
 
 29
 Mr. COLLIER. That is correct. I did not intend to cover them.
 
 
 30
 112 Cong.Rec. 11371 (1966). The critical concern for the legislators was not whether a parochial elementary school was an enterprise. They assumed that such a school was an enterprise and moved directly to the separate question of whether the nun was an employee.
 
 
 31
 The conclusion that church-operated schools are encompassed within the Act's definition of enterprise is supported by subsequent legislative action. Cf. Andrus v. Shell Oil Co., 446 U.S. 657, 666, 100 S.Ct. 1932, 1938, 64 L.Ed.2d 593 (1980); see also 2A Sutherland Statutory Construction Sec. 49.11 (Sands 4th ed. 1984). In 1977, Congress again amended the FLSA to create an exemption for "religious or non-profit educational conference center[s]." 29 U.S.C. Sec. 213(a)(3); see also 123 Cong.Rec. 32724-26 (1977). Such an exemption would not have been necessary if church-operated educational facilities had been excluded under the statutory definition of enterprise.
 
 
 32
 Inclusion of church-operated schools under the protective umbrella of the Act is also consistent with Supreme Court precedent construing the FLSA "liberally to apply to the furthest reaches consistent with congressional direction." Alamo, 471 U.S. at 296, 105 S.Ct. at 1959 (quoting Mitchell v. Lublin, McGaughy & Assocs., 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959)).
 
 
 33
 We therefore hold that the history of the statute demonstrates an affirmative intention by legislators to treat church-operated schools as enterprises. Accord Marshall v. First Baptist Church, 23 Wage & Hour Cas. (BNA) 386, 1977 WL 1755 (D.S.C.1977); see also Ritter v. Mount St. Mary's College, 495 F.Supp. 724 (D.Md.1980) (holding to the contrary), rev'd in relevant part, 738 F.2d 431 (4th Cir.1984) (table). The Ninth Circuit implicitly acknowledged this principle in EEOC v. Fremont Christian School, 781 F.2d 1362, 1367 (9th Cir.1986), applying the equal pay provisions of the FLSA to a church-operated school which provided health insurance only for heads of households. See also Russell v. Belmont College, 554 F.Supp. 667, 670-76 (M.D.Tenn.1982) (denying college's motion for summary judgment); Marshall v. Pacific Union Conference, 23 Wage & Hour Cas. (BNA) 316, 1977 WL 885 (C.D.Cal.1977) (denying conference's motion for summary judgment)[8]; cf. Archbishop of Roman Catholic Apostolic Archdiocese v. Guardiola, 628 F.Supp. 1173, 1178-79 (D.P.R.1985) (holding lay Catholic Church employees are covered by the Puerto Rico Minimum Wage Act, which is modeled on the FLSA).[9]
 
 
 34
 Shenandoah urges nevertheless that Roanoke Valley should not be covered by the statute because it is inextricably intertwined with the church. It argues that school employees are really church employees and therefore not covered by the FLSA. Shenandoah asserts that the church and school share a common physical plant and a common payroll account, that the associate pastor for school ministries reports to the pastor, that the pastor hires all teachers, and that school staff must subscribe to Shenandoah's statement of faith.[10] Shenandoah insists, "The school is the church."
 
 
 35
 Shenandoah relies on Corporation of Presiding Bishop v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), and Forest Hills Early Learning Center v. Grace Baptist Church, 846 F.2d 260, 263-64 (4th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989), for the proposition that the government should be required to accept the church's characterization of Roanoke Valley as an inseverable part of the church. Shenandoah's reliance is misplaced. These cases only considered whether legislators could exempt religious organizations from certain statutory provisions without running afoul of the First Amendment. They concluded that such exemptions were constitutionally permissible; they did not hold that they were mandatory. See County of Allegheny v. Pittsburgh ACLU, 492 U.S. ----, 109 S.Ct. 3086, 3105 n. 51, 106 L.Ed.2d 472 (1989). The case sub judice presents an entirely different question--whether Congress intended the FLSA to include (not exclude, as in Amos and Forest Hills ) church-operated schools. We hold that Congress affirmatively intended the Act to apply to such schools.
 
 
 36
 Shenandoah also asserts that the second criterion for application of the Fair Labor Standards Act is not present here because Roanoke Valley teachers are not "employees."[11] It urges that they are ministers and therefore covered by the "ministerial exemption" from the Act.[12] This exemption is derived from the congressional debate excerpted above and delineated in guidelines issued by the Labor Department's Wage and Hour Administrator:
 
 
 37
 Persons such as nuns, monks, priests, lay brothers, ministers, deacons and other members of religious orders who serve pursuant to their religious obligations in the schools ... operated by their church or religious order shall not be considered to be "employees".
 
 
 38
 Field Operations Handbook, Wage and Hour Division, U.S. Dep't of Labor, Sec. 10b03(b) (1967). Shenandoah states that Roanoke Valley teachers consider teaching to be their personal ministry. It urges that all classes are taught from a pervasively religious perspective, and that teachers lead students in prayer and are required to subscribe to the Shenandoah statement of faith as a condition of employment.
 
 
 39
 Shenandoah contends that the characterization of Roanoke Valley teachers as ministers is consistent with this court's holding in Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164 (4th Cir.1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). In Rayburn, we explained that the ministerial exemption in Title VII depended upon the function of the position, not simply on ordination. Id. at 1168. But the facts of Rayburn are far removed from those of the case at bar. There the claimant, whom we ultimately characterized as clergy, was a woman who held the degree of Master of Divinity from the church's theological seminary and who sought appointment to the seven-person pastoral staff of one of the denomination's largest congregations.[13]
 
 
 40
 The teachers in the present case perform no sacerdotal functions; neither do they serve as church governors. They belong to no clearly delineated religious order. Shenandoah insists that there is no cognizable difference between its teachers and nuns who teach in church-affiliated schools, but it has failed to adequately support this assertion.[14] Cf. Fiedler v. Marumsco Christian School, 631 F.2d 1144, 1153 (4th Cir.1980); Triple "AAA" Co. v. Wirtz, 378 F.2d 884, 887 (10th Cir.), cert. denied, 389 U.S. 959, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967).
 
 
 41
 This is not to minimize the vocation of the Roanoke Valley teachers or the sincerity which they bring to it. But "[e]xemptions from the Fair Labor Standards Act are narrowly construed," Hodgson v. Duke Univ., 460 F.2d 172, 174 (4th Cir.1972), and, as the district court has observed, the exemption of these teachers would "create an exception capable of swallowing up the rule." Shenandoah I, 573 F.Supp. at 323. We therefore decline to give the ministerial exemption the sweeping interpretation Shenandoah seeks.[15] The Supreme Court has explained "[t]he test of employment under the Act is one of 'economic reality.' " Alamo, 471 U.S. at 301, 105 S.Ct. at 1961. The economic reality in this case is that the Roanoke Valley teachers are employed as lay teachers in a church-operated private school.
 
 
 42
 We therefore hold that Congress intended church-operated schools such as Roanoke Valley to be covered by the Fair Labor Standards Act, and that their teachers and support staff are employees under the Act. We next consider the constitutional challenges raised by Shenandoah Baptist to application of the statute.
 
 IV. Free Exercise of Religion
 
 43
 Shenandoah and its intervenors argue that application of the Fair Labor Standards Act impermissibly burdens their first amendment right to free exercise of their religious beliefs. Our review of this free exercise claim requires that we first examine the burden on the exercise of Shenandoah's sincerely-held religious beliefs, then determine whether the state presents a compelling justification for imposing this burden, and finally balance the burden on free exercise against the hindrance to the state's goal that would arise from exempting Shenandoah from the Act's coverage. Rayburn, 772 F.2d at 1168 (citing Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).
 
 
 44
 Shenandoah urges that application of the FLSA impairs the church's ability to administer its relationship with employees and thereby its "power to decide ..., free from state interference, matters of church government as well as those of faith and doctrine." Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952). Shenandoah further asserts that its head-of-household practice was based on a sincerely-held belief derived from the Bible. The intervenors claim that allowing their wages to be set by the government, rather than by church governors acting under divine guidance, deprives them of blessings they would otherwise receive by allowing their Lord to supply their needs. On these bases, the church and intervenors insist that application of the Act to Roanoke Valley would burden the free exercise of their religious beliefs.
 
 
 45
 However, our examination of the record reveals that any burden would be limited. The pay requirements at issue do not cut to the heart of Shenandoah beliefs. Although Shenandoah's head-of-household pay supplement was grounded on a biblical passage, church members testified that the Bible does not mandate a pay differential based on sex. They also testified that no Shenandoah doctrine prevents Roanoke Valley from paying women as much as men or from paying the minimum wage. Indeed, the school now complies with the FLSA: teachers were last paid a head-of-household supplement in 1986, and all support staff members have been paid at or above minimum wage levels since 1982. The fact that Roanoke Valley must incur increased payroll expenses to conform to FLSA requirements is not the sort of burden that is determinative in a free exercise claim. Cf. Jimmy Swaggart Ministries v. Board of Equalization, --- U.S. ----, 110 S.Ct. 688, 698, 107 L.Ed.2d 796 (1990); Hernandez v. Commissioner, 490 U.S. ----, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989); Bob Jones Univ. v. United States, 461 U.S. 574, 603-04, 103 S.Ct. 2017, 2034-35, 76 L.Ed.2d 157 (1983); Braunfeld v. Brown, 366 U.S. 599, 605-06, 81 S.Ct. 1144, 1146-47, 6 L.Ed.2d 563 (1961). Furthermore, the pastor testified that Shenandoah had no objection to complying with state fire, health, and safety requirements, and had withheld income tax from employees' wages and paid social security tax.
 
 
 46
 Regarding the intervenors' assertion that receipt of a government-mandated minimum wage may interfere with their reliance on God, we observe, as did the court below and the Supreme Court in Alamo, that the intervenors retain the option of volunteering their services or returning to Shenandoah all or part of their back pay awards. See 471 U.S. at 304, 105 S.Ct. at 1963.
 
 
 47
 Against what is, at most, a limited burden to Shenandoah's free exercise rights, we must weigh the reasons for applying both the minimum wage and equal pay provisions of the FLSA to Roanoke Valley. These reasons must be compelling. Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 141-42, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987). We find that they are. The Seventh Circuit has described the Fair Labor Standards Act as "a remedial measure seeking to insure to the workers of the United States ... a minimum wage sufficient to maintain a minimum standard of living which Congress deemed to be necessary to their well-being." Mitchell v. Pilgrim Holiness Church Corp., 210 F.2d 879, 883 (7th Cir.), cert. denied, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954); see also Alamo, 471 U.S. at 302, 105 S.Ct. at 1962. Concerning the equal pay provisions of the FLSA, the Supreme Court has explained:
 
 
 48
 Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry--the fact that the wage structure of "many segments of American industry has been based on an ancient but out-moded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same."
 
 
 49
 Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (quoting S.Rep. No. 176, 88th Cong., 1st Sess. 1 (1963)); cf. Rayburn, 772 F.2d at 1168 ("It would ... be difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin."). We therefore conclude that this case presents state "interests of the highest order," Yoder, 406 U.S. at 215, 92 S.Ct. at 1533, against which we must weigh the concerns of Shenandoah and its intervenors.
 
 
 50
 In this case, the balance tips toward the application of the FLSA to Roanoke Valley. There is no principled way of exempting the school without exempting all other sectarian schools and thereby the thousands of lay teachers and staff members on their payrolls. This would undermine the congressional goal of making minimum wage and equal pay requirements applicable to private as well as public schools.[16] Cf. United States v. Lee, 455 U.S. 252, 259-60, 102 S.Ct. 1051, 1056, 71 L.Ed.2d 127 (1982). Congress has here created a comprehensive statute, and a less restrictive means of attaining its aims is not available. See Braunfeld, 366 U.S. at 607, 81 S.Ct. at 1148; cf. Sherbert v. Verner, 374 U.S. 398, 408-09, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963). See generally New Life Baptist Church Academy v. East Longmeadow, 885 F.2d 940, 946-48 (1st Cir.1989). As the Supreme Court explained in Alamo, "the purposes of the Act require that it be applied even to those who would decline its protections." 471 U.S. at 302, 105 S.Ct. at 1962. We therefore conclude that application of the FLSA to Roanoke Valley does not violate the first amendment free exercise rights of Shenandoah or the intervenors.
 
 V. Establishment of Religion
 
 51
 Shenandoah next urges that application of the Fair Labor Standards Act to Roanoke Valley violates the establishment clause. Our analysis is, of course, guided by Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), which held that to pass constitutional muster a statute must (1) have a secular legislative purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster excessive government entanglement with religion. Shenandoah does not dispute that the FLSA has a secular purpose. However, the church protests that the effect of the FLSA is to violate "[t]he clearest command of the Establishment Clause ... that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982).
 
 
 52
 Shenandoah claims that the Roman Catholic Church is officially preferred under the Act because nuns and priests are included in the ministerial exemption while lay teachers and staff members at Roanoke Valley are not. We do not agree that the ministerial exemption creates an official preference. The exemption is facially neutral, encompassing ministers, deacons, and members of religious orders in any faith, not exclusively Catholic nuns and priests. See Hernandez, 109 S.Ct. at 2146-47. It is based on a determination that members of the clergy should not be characterized as employees, not on a decision to prefer any specific religion. See 112 Cong.Rec. 11371 (1966) (excerpted supra ). Lay teachers and support staff at Catholic schools are covered by the FLSA as are the lay teachers and staff at Roanoke Valley. The Supreme Court has held that such a facially neutral provision which accommodates free exercise values does not constitute an establishment clause violation. Gillette v. United States, 401 U.S. 437, 451-54, 91 S.Ct. 828, 837-38, 28 L.Ed.2d 168 (1971).
 
 
 53
 Shenandoah also asserts that applying the Act to Roanoke Valley spawns impermissible government entanglement with religion. The church complains that the government inspection, monitoring, and review required to implement the Act intrude into church affairs. See Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111. But the Supreme Court rejected this argument in Alamo, holding that "the recordkeeping requirements of the Fair Labor Standards Act, while perhaps more burdensome in terms of paperwork, are not significantly more intrusive into religious affairs" than fire inspection and building and zoning regulations. 471 U.S. at 305-06, 105 S.Ct. at 1963-64; see also Swaggart, 110 S.Ct. at 698-99; Hernandez, 109 S.Ct. at 2147-48.[17] We therefore hold that the application of the Fair Labor Standards Act to Roanoke Valley does not violate the establishment clause of the first amendment.
 
 VI. Equal Protection
 
 54
 Shenandoah's final constitutional argument is that the application of the Fair Labor Standards Act to Roanoke Valley violates the equal protection guarantee implicit in the fifth amendment. See Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Again Shenandoah points to the ministerial exemption, arguing that it creates a suspect classification which invidiously discriminates against adherents of religions that do not have formal religious orders. As the Supreme Court observed in Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944), this is but another phrasing of the first amendment arguments we have already considered. There is "no justification for applying strict scrutiny to a statute that passes the Lemon test. The proper inquiry is whether Congress has chosen a rational classification to further a legitimate end." Amos, 483 U.S. at 339, 107 S.Ct. at 2870.
 
 
 55
 Courts analyzing similar ministerial exemptions in an equal protection context have upheld the exemptions as a rational means of creating a buffer between church and state. See, e.g., Bethel Baptist Church v. United States, 822 F.2d 1334, 1341-42 (3d Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988); Olsen v. Commissioner, 709 F.2d 278, 282-83 (4th Cir.1983). The same reasoning applies here and we find no fifth amendment violation.
 
 VII. Relief
 
 56
 Shenandoah and the government each challenge aspects of the remedy crafted by the district court in this case. Shenandoah argues that the court erred in calculating back pay on both the equal pay and minimum wage claims. The government contends that the trial court erred in refusing to award prejudgment interest and in denying injunctive relief. We find all of these contentions to be without merit.
 
 
 57
 The district court awarded $177,680 to the government on behalf of female teachers on the equal pay claim. Shenandoah seeks to reduce this sum by arguing that the court should not have awarded damages for supplements not paid to single female teachers. The Supreme Court has explained that in equal pay claims
 
 
 58
 once the [government] has carried [its] burden of showing that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden shifts to the employer to show that the differential is justified....
 
 
 59
 Corning Glass, 417 U.S. at 196, 94 S.Ct. at 2229. Shenandoah stipulated that women were paid less than men at Roanoke Valley.[18] It bore the burden of proving that gender was not the reason for this discrepancy.
 
 
 60
 As its affirmative defense, Shenandoah urges that single female teachers were discriminated against on the basis of marital status, not sex. See 29 U.S.C. Sec. 206(d)(1)(iv). It relies on the fact that the sole unmarried male teacher employed by Roanoke Valley was not paid a head-of-household supplement. Shenandoah asserts that single people of either sex were ineligible for the supplement. But the trial court also had before it evidence that marital status was not the determinative factor. Three years after the commencement of this action, Roanoke Valley deviated from its asserted policy and began paying supplements to some single people--divorced mothers with dependents. This conflicts with Shenandoah's assertion that only married people qualified for the supplement. In the group that Shenandoah describes as eligible for the extra pay--married people--it admitted discriminating against women by not making the supplement available to them on the same basis as to men.
 
 
 61
 The district court rejected Shenandoah's argument that it used marital status as the threshold consideration in determining eligibility for the head-of-household supplement, stating "[t]he court need not decide if Shenandoah could legally have paid a supplement to all married teachers while denying it to all single teachers performing the same work, for that is not the policy the church followed." Shenandoah II, 707 F.Supp. at 1464. In light of all the evidence, we cannot hold clearly erroneous the trial court's finding that Shenandoah failed to carry its burden of proving that the salary differential was "not based on a factor other than sex." See Brewster v. Barnes, 788 F.2d 985, 992 (4th Cir.1986).
 
 
 62
 Shenandoah also complains of the district court's back pay award on the minimum wage claims. The district court awarded $16,818.46. The parties had stipulated that amount as the difference in the wages the ninety-one affected support staff members actually received between 1976 and 1982 and what they would have received, had they been paid the minimum wage. Shenandoah urges the court erred in not considering whether the work of these support staff members was performed for the church or for the school. But Shenandoah also asserts that "some of the work is so interrelated ... that it would be virtually impossible to assign an amount to either category." Shenandoah directs us to no evidence produced at trial that would provide a basis for distinguishing between church- and school-related labor. Given that the trial court was not provided with a sufficient evidentiary basis on which to make the distinction Shenandoah seeks, the court did not err in awarding back pay based on the stipulation.
 
 
 63
 The government has cross-appealed, claiming that the district court erred in refusing to award prejudgment interest. Normally, "[p]rejudgment interest is necessary, in the absence of liquidated damages, to make the individual discriminatee whole." Cline v. Roadway Express, 689 F.2d 481, 489 (4th Cir.1982). However, the decision whether to award interest is within the trial court's discretion. Id. On the narrow facts of this case, we find the equitable considerations sufficient to avoid a finding of abuse of discretion. Neither do we find that the district court abused its discretion in refusing to grant injunctive relief, in light of the fact that Roanoke Valley has been in compliance with the Act since 1986.
 
 
 64
 * * *
 
 
 65
 To summarize, we conclude that Congress affirmatively intended the Fair Labor Standards Act to apply to church-operated schools and that application of the Act to Roanoke Valley does not violate the first or fifth amendment rights of the church or the intervenors in this action. We affirm the district court award of $16,818.46 back pay for support staff members who were subject to minimum wage violations and of $177,680 back pay for teachers who were subject to equal pay violations. We also affirm the denial of prejudgment interest and injunctive relief.
 
 
 66
 AFFIRMED.
 
 
 
 [1]
 Title 29 U.S.C. Secs. 201 et seq. The Equal Pay Act of 1963 amended the FLSA and is codified at Sec. 206(d)
 
 
 [2]
 Title 29 U.S.C. Sec. 216 authorizes the government to sue on behalf of employees and to supervise the distribution of any funds recovered. This claim was filed by the Secretary of Labor. Elizabeth Dole, the current Secretary, is named in the caption of this opinion pursuant to Fed.R.App.P. 43(c)(1). When administration of equal pay claims was transferred to the Equal Employment Opportunity Commission (EEOC) in 1979, the EEOC joined the action as a plaintiff. The Secretary of Labor and the EEOC are referred to in this opinion as "the government."
 
 
 [3]
 Teachers and academic administrators are exempt from the Act's minimum wage provisions, but are covered by its equal pay requirements. 29 U.S.C. Sec. 213(a)(1)
 
 
 [4]
 A motion by the government for partial summary judgment on the equal pay claim was denied in 1987
 
 
 [5]
 On appeal, the government no longer asks that Shenandoah be prohibited from soliciting employees for the return of back wages. It appeals only the court's refusal to enjoin Shenandoah from violating the Act in the future
 
 
 [6]
 The ordinary commercial activities of religious organizations are covered by the Act. See, e.g., id. 471 U.S. at 298-99, 105 S.Ct. at 1959-60; Brock v. Wendell's Woodwork, 867 F.2d 196, 198-99 (4th Cir.1989); Mitchell v. Pilgrim Holiness Church Corp., 210 F.2d 879, 884 (7th Cir.), cert. denied, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954)
 
 
 [7]
 In Catholic Bishop, the Court held that in a case raising serious first amendment questions, "we must first identify the affirmative intention of the Congress clearly expressed" before concluding that the statute applies. Id. But the Alamo Court appeared to back away from this heightened level of statutory analysis, saying, "Because we perceive no 'significant risk' of an infringement on First Amendment rights, we do not require any clearer expression of congressional intent to regulate these activities." 471 U.S. at 298 n. 18, 105 S.Ct. at 1960 n. 18 (citations omitted). Justice White, who authored the Alamo opinion, was a dissenter in Catholic Bishop
 The tension between these two cases does not present a problem here because, under the more exacting Catholic Bishop standard, we find that Congress affirmatively intended to apply the FLSA to schools such as Roanoke Valley.
 
 
 [8]
 Justice Rehnquist, acting as circuit justice, subsequently refused to stay discovery in Pacific Union Conference v. Marshall, 434 U.S. 1305, 98 S.Ct. 2, 54 L.Ed.2d 17 (1977); see also Donovan v. Central Baptist Church, Victoria, 96 F.R.D. 4 (S.D.Tex.1982) (denying church's motion for protective order)
 
 
 [9]
 Cases declining to apply labor statutes to church-operated schools have involved other statutes with legislative histories devoid of any indication as to the applicability of the statute to religious schools. See, e.g., Catholic Bishop, 440 U.S. at 504-06, 99 S.Ct. at 1320-21 (NLRA); Cochran v. St. Louis Preparatory Seminary, 717 F.Supp. 1413, 1416 (E.D.Mo.1989) (ADEA). Here, the legislative history favors application of the FLSA to Roanoke Valley
 
 
 [10]
 Shenandoah points to St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981), which held that teachers in a Christian school that did not have a separate legal identity from the church were employees of the church. However, St. Martin turned on the construction of an unemployment compensation statute which explicitly distinguished between employees of a church and employees of separately incorporated organizations. 451 U.S. at 782, 101 S.Ct. at 2148. Congress did not create the framework for such a distinction in the FLSA
 
 
 [11]
 The statutory definition of employee is singularly unhelpful. It states: "[T]he term 'employee' means any individual employed by an employer." 29 U.S.C. Sec. 203(e)(1)
 
 
 [12]
 Shenandoah had also argued below that nonprofessional support staff members were ministers and subject to the exemption. The district court rejected this argument, Shenandoah I, 573 F.Supp. at 323, and Shenandoah does not raise it in a statutory context on appeal
 
 
 [13]
 Another Title VII case relied on by Shenandoah is also factually distinct. In EEOC v. Southwestern Baptist Theological Seminary, 651 F.2d 277, 283 (5th Cir.1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982), the Fifth Circuit held members of the faculty of a theological seminary to be ministers; however, most were ordained members of the clergy whose job it was to train "the future ministers of many local Baptist churches." The Southwestern Baptist court also expressly stated that, "While religious organizations may designate persons as ministers for their religious purposes free from any governmental interference, bestowal of such a designation does not control their extra-religious legal status." Id
 
 
 [14]
 Shenandoah directs us to the testimony of one Roanoke Valley teacher who attended a Catholic school as a child and testified that her role as a teacher at Roanoke Valley was the same as that of a nun in a Catholic school. Another Shenandoah witness, the executive director of the Association of Christian Schools International, discussed the role of nuns in school, but the district court found "his description of his research ... too ambiguous for the court to credit his expertise in the subject." Having reviewed the evidence, we agree with the district court's characterization
 
 
 [15]
 Ministerial exemptions have also been construed narrowly in other contexts. "Certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister." Dickinson v. United States, 346 U.S. 389, 394, 74 S.Ct. 152, 156, 98 L.Ed. 132 (1953) (selective service); see also Olsen v. Commissioner, 709 F.2d 278, 282 (4th Cir.1983) (tax)
 
 
 [16]
 Shenandoah urges that the congressional exception for religious orders demonstrates that its interest in application of the FLSA is less than compelling. We do not agree that the closely circumscribed ministerial exemption has such an effect. See Hernandez, 109 S.Ct. at 2149. To conclude otherwise would "radically restrict the operating latitude of the legislature." Braunfeld, 366 U.S. at 606, 81 S.Ct. at 1147
 
 
 [17]
 See also Alamo, 471 U.S. at 305 & n. 31, 105 S.Ct. at 1963-64 & n. 31, distinguishing FLSA requirements from "the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion."
 Shenandoah points to the 10-year history of this case and its requirements for producing records as proof of the entanglement problems arising from the FLSA. If Shenandoah's reasoning were followed to its logical conclusion, the government could never bring any claim against a religious organization without running afoul of the establishment clause. But "[e]ven religious schools cannot claim to be wholly free from some state regulation." Ohio Civil Rights Comm'n v. Dayton Schools, 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) (citing Yoder, 406 U.S. at 213, 92 S.Ct. at 1532).
 
 
 [18]
 The stipulation reveals the following:
 Female Teachers Male Teachers
School Year Receiving Supplement/ Receiving Supplement/
 Total Female Teachers Total Male Teachers
----------------------------------------------------------------------
197677 0/15 3/4
197778 0/16 4/5
197879 0/20 4/4
197980 0/25 4/4
198081 0/21 5/5
198182 1/19 7/7
198283 1/23 6/6
198384 2/23 6/6
198485 3/26 6/6
198586 1/24 5/5
 This table includes only teachers who worked on a full-time basis.