**Ronald W. ROSENBERGER, as a member of Wide Awake Productions, et al., Plaintiffs,**

v.

**The RECTOR AND VISITORS OF the UNIVERSITY OF VIRGINIA, et al., Defendants.**

**Civ. A. No. 91–0036–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

May 20, 1992.

---

James R. Murray, Jackson R. Sharman, III, Covington & Burling, Washington, D.C., George H. Dygert, George H. Dygert & Assoc., Charlottesville, Va., Michael P. McDonald, Center for Individual Rights, Washington, D.C., for plaintiffs.

Mary Sue Terry, Atty. Gen., Caroline L. Lockerby, Asst. Atty. Gen., Office of Atty. Gen., Richmond, Va., James J. Mingle, Sp. Asst. Atty. Gen., University of Virginia, Charlottesville, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

In this case, the court is asked to resolve the difficult question of whether a "student activities fund," comprised of mandatory student fees, constitutes a limited public forum. For the reasons set forth below,

the court concludes that the answer to this riddle is "no."

## I.

In September of 1990, plaintiff Ronald W. Rosenberger, an undergraduate student at the University of Virginia (the University), joined with other University students to form Wide Awake Productions (WAP). WAP is an unincorporated association officially recognized by the University as a Contracted Independent Organization (CIO). This recognition is given to all student organizations which execute an annual agreement with the University and meet certain minimal requirements.[1] The benefit of becoming a CIO is that such organizations are given access to University facilities; i.e. meeting rooms, computer terminals, etc.

WAP publishes Wide Awake Magazine (Wide Awake), a non-profit journal written, edited and published by the student members of WAP. Mr. Rosenberger serves as the magazine's publisher, while other named plaintiffs include members of the management and editorial staff. To date, three issues of Wide Awake have been published, with approximately 5,000 copies of each issue distributed free of charge to students on the University campus.

In January of 1991, WAP submitted an application for funding from the University in the amount of $5,862.00 to offset the cost of publishing its magazine. Specifically, WAP sought funding from monies deposited in the University's Student Activities Fund (SAF). The SAF is funded by a mandatory student activities fee collected from every full-time student at the University. The activity fee is designed to provide financial support for student organizations related to the educational purposes of the University.

The defendants in this action, the Rector and Board of Visitors of the University (the Board)[2] have ultimate responsibility for the operation of the SAF. The Board has delegated the responsibility of allocating SAF funds to the University's Student Council. The Student Council disburses SAF funds to those CIOs deemed eligible for funding as determined by Guidelines issued by the Board. These Guidelines prohibit several categories of student organizations from obtaining SAF funds. Ineligible groups include fraternities and sororities, political and religious organizations, and those groups whose membership is exclusionary in nature. Further, the following expenditures and activities are also excluded by the Guidelines: (1) honoraria or similar fees; (2) religious activities; (3) social entertainment or related expenses; (4) philanthropic contributions and activities; and (5) political activities.

A CIO seeking SAF monies must first submit a request for funding to the Student Council Appropriations Committee, a subcommittee of the full Student Council. As noted earlier, WAP made its first and only request for funding in January of 1991. The Chairman of the Student Council denied the funding request because the Appropriations Committee determined that publication of Wide Awake constituted a "religious activity."[3] WAP appealed this decision to the full Student Council, which affirmed the Appropriation Committee's denial of funding. WAP pursued all internal means of appeal before filing suit in this court on July 11, 1991. The plaintiffs allege that the denial of SAF benefits vio-

---

1. There are four general criteria for CIO status: (1) at least fifty-one percent of the group's members must be students; (2) the group's officers must all be full-time, fee-paying students; (3) the group must keep an updated copy of its constitution on file with the University; and (4) the group must sign an anti-discrimination disclaimer.

2. The individual Board members and Mr. Robert Stump, Associate Dean of Students, are named defendants and are being sued in their official capacities.

3. Mr. Rosenberger admits that Wide Awake is written from a "religious perspective." Further, Article 1 of WAP's constitution states that the purpose of the organization is to: (1) publish a magazine of philosophical and religious expressions; (2) facilitate discussion which fosters an atmosphere of sensitivity to and tolerance of Christian viewpoints; and (3) provide a unifying focus for Christians of multicultural backgrounds.

lates their rights to freedom of speech, freedom of press, freedom of association, free exercise of religion, and equal protection of the laws in violation of the United States Constitution, the Virginia Constitution, and the Virginia Act for Religious Freedom. Plaintiffs have also set forth a cause of action pursuant to 42 U.S.C. Section 1983.

On November 12, 1991, the plaintiffs filed a motion for summary judgment, asking this court for a declaratory judgment that the defendants had indeed violated the plaintiff's constitutional rights. The defendants filed a cross motion for summary judgment and both sides appeared before this court for oral argument on these motions. Both sides agree, with minor exceptions addressed herein, that there are no genuine issues of material fact in conflict. Thus, this matter is ripe for disposition.[4]

## II. The Freedom of Speech Claims

The preliminary question for this court to resolve is whether the University's SAF qualifies as a "limited public forum" as the plaintiffs assert, or whether the SAF is in fact a "non-public" forum, as the defendants argue. This determination is crucial as it dictates the degree of scrutiny to be used by this court in reviewing the Board of Visitor Guidelines.[5] *See Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.") *See also Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985) ("the extent to which the Government may limit access [to a forum] depends on whether the forum is public or nonpublic.")

The phrase "limited public forum" describes one of three categories of fora identified by the Supreme Court in *Perry, supra.*[6] A limited public forum is property "which the State has opened for use by the public even if it was not required to create the forum in the first place." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955 *citing Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). A state may only restrict access to limited public fora if such a restriction is narrowly drawn to effectuate a compelling state interest. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. A different category of property consists of public property which is not "by tradition or designation a forum for public communication." *Id.* Not surprisingly, this type of property is labeled "nonpublic." Access to such a forum can be limited by restrictions which are " 'reasonable and [are] not an effort to suppress expression merely because the public officials oppose the speaker's view.' " *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448 quoting *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

It should be apparent from the preceding discussion that the label affixed to the University's SAF (either limited public forum or nonpublic forum) will have a rather profound impact on whether the Board's Guidelines will be upheld by this court. The plaintiffs rely heavily on *Gay and Lesbian Students Assn. v. Gohn*, 850 F.2d 361 (8th Cir.1988) for the proposition that "compulsory student activities fees" constitute a limited public forum. In *Gohn*, the Gay and Lesbian Students Association (GLSA) at the University of Arkansas at Fayetteville challenged the decision of the Student Senate denying funding to the

---

**4.** The defendants have filed a motion to dismiss the plaintiffs' claim for damages under 42 U.S.C. § 1983 on the grounds that such a claim is precluded by the Eleventh Amendment to the United States Constitution. The court need not address this issue as it has determined that all of the plaintiffs' claims must fail, as a matter of law.

**5.** The plaintiffs have launched a general assault on the propriety of certain exclusions in the

Guidelines; i.e. those prohibiting the funding of religious organizations and activities. Alternatively, the plaintiffs set forth an equal protection claim by arguing that the Guidelines have not been applied in an even-handed manner. The court will address the equal protection issue in part IV of this opinion.

**6.** The plaintiffs do not argue that the SAF is a traditional public forum.

group. The money was to be paid out of funds from "tuition, state tax money, and general fees collected from students." *Id.* at 361. In finding that the denial of funding violated GLSA's First Amendment rights, the court stated:

> we hold that a public body that chooses to fund speech or expression must do so even-handedly, without discriminating among recipients on the basis of their ideology. The University need not supply funds to student organizations; but once having decided to do so, it is bound by the First Amendment to act without regard to the content of the ideas being expressed.

*Id.* at 362.

This court does not read *Gohn* at holding that a student activities fund is a limited public forum. *Gohn* merely stands for the proposition that "content-based discrimination can be justified only if the government demonstrates that its regulation is narrowly drawn and is necessary to effectuate compelling state interests." *Id.* at 367 citing *Widmar*, 454 U.S. at 270, 102 S.Ct. at 274. The plaintiffs read this citation to *Widmar* and the mention of a "compelling state interest" as a signal that the Eighth Circuit considered the student activity fee as creating a limited public forum, thus requiring the use of a heightened level of scrutiny. This reading of *Gohn* stretches the Eighth Circuit's opinion beyond the breaking point.

The mere mention of heightened scrutiny does not in and of itself indicate that the court is dealing with either a traditional or a limited public forum. Heightened scrutiny can also be applied even if the forum is characterized as nonpublic. The Supreme Court recognized this in *Perry* by stating:

> Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, commu-

nicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because the public officials oppose the speaker's view.

460 U.S. at 46, 103 S.Ct. at 955 (citations omitted).

■ This passage from *Perry* indicates that viewpoint discrimination will *rarely* be tolerated, regardless of whether the restriction applies to public, limited or nonpublic fora. Further, a careful reading of *Gohn* indicates that the Eighth Circuit considered the student service funds as creating a nonpublic forum. Specifically, the court noted that:

> We realize that the District Court made no explicit finding as to the reason for denial of funding, that this is a question of fact, and that appellate courts are not fact-finding forums. We think, though, that the District Court's opinion, when read in full and in context, includes an implicit finding that funds were denied because of distaste for the GLSA's ideas. Otherwise, there would have been no need to resort to the legal doctrines (e.g. that there is no "right" to public money) used by the Court to justify dismissing the complaint. *A finding of fact that funds were denied for some content-neutral reason would have sufficed completely to dispose of the case.* In any event, the facts of this case are so obvious that a remand for an explicit finding would be a waste of time. This record leaves no reasonable doubt that funds were denied because of disagreement with GLSA's speech. (emphasis added).

*Gohn*, 850 F.2d at 367. Here, the court indicates that GLSA would have lost its case had the University of Arkansas put forth a content neutral reason for denying funding. This is not the standard used in limited public forum cases, but instead is the standard used in nonpublic forum situations.

This court also looks to *Cornelius, supra* for guidance as to whether the SAF qualifies as a public forum. Here, the Supreme Court began its forum analysis by

noting that, "[t]he government does not create a public forum by inaction *or by permitting limited discourse,* but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 citing *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. (emphasis added). In *Cornelius,* the Supreme Court held that the Federal Government could exclude legal defense and political advocacy organizations from participation in the Combined Federal Campaign (CFC), a charity drive directed at federal employees. The Court held that the campaign was a nonpublic forum because:

> [t]he Government's consistent policy has been to limit participation in the CFC to "appropriate" voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials ... The Civil Service Commission and, after 1978, the Office of Personnel Management developed extensive criteria to limit access to the Campaign to those organization considered appropriate. Such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum.

*Cornelius,* 473 U.S. at 804–5, 105 S.Ct. at 3450 (citations omitted).

In the present situation, the University has limited eligibility for SAF monies to those organizations deemed "appropriate." Religious organizations are but one of several groups excluded from participation in the SAF because the Board of Visitors has decided that such groups do not further the educational purposes of the University. This exclusion of religious groups and religious activities has been in effect since the establishment of the Guidelines in 1970, and has survived revisions in 1973, 1978, 1980 and 1991.

The plaintiffs attempt to counter this fact by arguing that "the defendants created the SAF mechanism to encourage the exchange of opinions and viewpoints among students at the University of Virginia in furtherance of the educational mis-sion of the University." In support of this assertion, the plaintiffs direct the court to the page 1 of the Guidelines. The Guidelines, in pertinent part, read as follows:

STATEMENT OF PURPOSE

> The purpose of the student activity fee is to provide financial support for student organizations that are related to the educational purpose of the University of Virginia. As a required student fee, the monies collected by the University for funding student activities are public funds which must be administered in a manner consistent with the educational purpose of the University as well as with state and federal law.

This court does not read this passage to indicate a desire on the part of the Board of Visitors to "encourage the exchange of opinions and viewpoints." Rather, the Guidelines suggest that the SAF was established to fund only those CIOs whose activities contributed to the educational focus of the University. The Board of Visitors has not opened the SAF coffers to all CIOs;[7] some groups, such as WAP, were excluded simply because the Board of Visitors determined that their activities were not consistent with the goals of the University. The consistent, purposeful exclusion of certain groups indicates that the SAF is indeed a nonpublic forum.

This conclusion is further supported by the Supreme Court's reasoning in *Perry, supra.* The forum in *Perry* consisted of an interschool mailing system used to facilitate communication between various teachers. A teacher's union challenged the local Board of Education's decision denying the union access to the system. The plaintiff union argued that the school mail facilities became a limited public forum because other private, non-school-connected groups had previously been given access to the system. *Perry,* 460 U.S. at 47, 103 S.Ct. at 956. In rejecting this contention, the Court stated:

> The use of the internal school mail by groups not affiliated with the schools is no doubt a relevant consideration. If by policy or by practice the Perry School

---

7. For the academic year 1990–91, 343 student organizations qualified as CIOs. Of these 135 applied for SAF funds and 118 were actually allotted SAF monies.

District has opened its mail system for indiscriminate use by the general public, then PLEA could justifiably argue a public forum has been created. This, however, is not the case. As the case comes before us, there is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public. Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material. We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into a public forum.

*Id.*

Similarly, the fact that the University has given certain CIOs access to SAF funds does not lead to the conclusion that such selective access transforms the SAF into a limited public forum.

Finally, the plaintiffs reliance on *Widmar* is misplaced. The present case might very well be resolved in plaintiffs favor if the University had denied CIO status to WAP. The defendants themselves take the position that access to certification as a CIO is a limited public forum. This is because only CIO's have access to University facilities.[8] This is a far cry from the present situation and is the reason why this court finds *Widmar* factually distinguishable from the case at hand.

██ Having concluded that the SAF is a nonpublic forum, this court must now determine whether the Board's Guidelines constitute restrictions which are "reason-

able and not an effort to suppress expression merely because public officials oppose the speaker' views." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. The defendants offer two basic rationales for excluding religious organizations such as WAP from SAF eligibility. First, the University has only limited funds to disburse and must therefore limit funding to those activities which it determines advance its educational mission. Second, the ineligibility of religious organizations and activities is justified based on the Federal and State constitutional mandate of state neutrality toward religion.

Although fiscal restraints are pertinent, this court may resolve the reasonableness of the Guidelines by reference to the University's second proffered reason. The parties devote considerable time in their respective briefs addressing the obvious Establishment Clause issues raised in this case. However, this court need not resolve this issue on the facts of this case. For even if the plaintiffs were correct in their assertion that funding Wide Awake would not violate Federal or State law, it is not the province of this court to second guess the legal judgments made by the University. So long as the University's Establishment Clause fears are reasonable, the Guideline restriction must stand. Given the complexity of the law in this regard, this court has little trouble in finding that the Guideline restriction is a reasonable limit to access to SAF funds. Further, the restriction is a reasonable response by the University to prevent excessive entanglement with religion.

The court also finds that the Guideline limitations do not result in viewpoint discrimination against religious organizations such as WAP. The plaintiffs seem to argue that any across the board restriction applied to a religious group results in content based discrimination. This may be

**8.** The plaintiffs allege that they have been denied access to certain University facilities yet have presented no evidence, beyond Mr. Rosenberger's affidavit, to support of this claim. For instance, there is no assertion that WAP has even attempted to use University facilities or computers. The defendants have submitted the affidavit of Mr. Stump, who swears that "[a]s a CIO, Wide Awake has been and is accorded the same access and use of University facilities as other CIOs." The court has considered this conflicting evidence in the light most favorable to the plaintiffs, but comes to the conclusion that WAP has not raised a genuine issue of material fact as to this issue.

true in the abstract, but this court, and the University, must live in the real world. It could be argued that every decision by the University results in viewpoint discrimination. On this point, the court finds Justice Stevens' comments in his concurring opinion in *Widmar* to be highly relevant. Justice Stevens states that:

In performing their learning and teaching missions, the managers of a university routinely make countless decisions based on the content of communicative materials. They select books for inclusion in the library, they hire professors on the basis of their academic philosophies, they select courses for inclusion in the curriculum, and they reward scholars for what they have written. In addition, in encouraging students to participate in extracurricular activities, they necessarily make decisions concerning the content of those activities.

*Widmar*, 454 U.S. at 278, 102 S.Ct. at 278.

In brief, the plaintiffs' complaints about the Guidelines are more properly directed at the wisdom and not the legality of the restrictions. This is because the court finds, as a matter of law, that the Board's Guidelines are reasonable and do not violate any of the plaintiffs' constitutional rights.[9]

### III. The Free Exercise of Religion Claims

■ The heart of the plaintiffs' claim is that without SAF monies WAP must devote more time to fund raising and less time to publishing its religious speech. Thus, the denial of funding burdens the plaintiffs' free exercise of religion by diverting energy away from WAP's main goal: challenging Christians to live according to their faith.

Both sides agree that this court's analysis should begin with *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir.) *cert. denied,* —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990). Here, the Fourth Circuit stated that in reviewing a free exercise claim, a court should:

... examine the burden on the exercise of ... [plaintiff's] sincerely held religious beliefs, then determine whether the state presents a compelling justification for imposing this burden, and finally balancing the burden on free exercise against the state's ... [compelling interest].

*Id.* at 1397.

In the present case, it is difficult for this court to identify any burden of constitutional magnitude that has been imposed on the plaintiffs. It is logical to assume that publishing a magazine is easier if someone else pays the bills. However, if this incidental burden was of constitutional significance, the free exercise clause would be implicated in every funding decision involving a religious organization. A review of the record indicates that WAP is unable to point to any facts making their burden unique from other CIOs which have been denied SAF monies. Political groups and fraternities and sororities share a common plight with WAP: none of these groups is eligible for funding. The only distinguishing factor is that WAP engages in religious activity. However, WAP has not cited this court to any authority indicating that religious organizations should receive preferential access to a nonpublic forum.

The plaintiffs' attempt to bridge this gap in their argument by asserting that "freedom of expression may not be infringed by denying a privilege." WAP relies on *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) to support this position. This court does not read *Sherbert* as broadly as do the plaintiffs. In *Employment Div., Dept. of Human Resources v. Smith*, 494 U.S. 872, 883, 110 S.Ct. 1595, 1602, 108 L.Ed.2d 876 (1990), the Court stated that, "[u]nder the *Sherbert* test, governmental actions that *substantially* burden a religious practice must be justified by a compelling governmental interest." (emphasis added). This lan-

---

**9.** In their briefs and in oral argument, the parties did not separately address plaintiffs' claims under Federal and State law. Although the court has focused on Federal Constitutional law, the preceding analysis applies to the plaintiffs' claims based on the Virginia Constitution and the Virginia Act for Religious Freedom.

guage itself indicates that a burden must be substantial before the court will consider whether the state has a compelling reason for the restriction.[10] The Fourth Circuit appears to have adopted this position in *Goodall v. Stafford County School Board,* 930 F.2d 363 (4th Cir.) *cert. denied* —— U.S. ——, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991). Here the court stated that

> [w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Goodall,* 930 F.2d at 369 quoting *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).[11]

Even if this court were to consider the Board's Guidelines as imposing a burden on WAP's free exercise of religion, WAP is still bound by the Fourth Circuit's holding in *Goodall, supra,* that avoidance of a violation of the Establishment Clause constitutes a compelling state interest. *Goodall,* 930 F.2d at 370. Further, balancing the minimal burden on the plaintiffs with the defendants rationale for the Guidelines indicates that the scale must come down in favor of the defendants.

IV. The Equal Protection Claims

■ The last issue for the court to resolve in the plaintiffs' claims that the Guidelines have been applied in less than an even-handed manner. Put somewhat differently, the plaintiffs contend that they have been denied equal protection of the laws because other "religious groups" have been given SAF monies. As evidence of

this unequal treatment, WAP focuses on the funding decisions make with respect to other CIOs.

The defendants seek to counter this argument by citing this court to *Irby v. Virginia State Board of Elections,* 889 F.2d 1352 (4th Cir.1989), *cert. denied* 496 U.S. 906, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990). *Irby* stands for the proposition that a plaintiff challenging a facially neutral statute with an equal protection claim must show not only disparate effect, but also discriminatory intent. Thus, the defendants do not argue that the Student Council's funding decisions are always correct. Instead, the defendants argue that there is no evidence to suggest that the Student Council's decision to deny funding to WAP resulted from discriminatory intent.

In their reply brief, the plaintiffs do not dispute the defendants statement of the law nor the facts on this issue. The court has reviewed the entire record independently, and cannot find any evidence to indicate that the decision to deny funding to WAP was based on discriminatory intent. Accordingly, summary judgment in favor of the defendants is appropriate.

In summary, the court holds that access to the SAF is a nonpublic forum upon which the University has imposed reasonable restrictions. These restrictions do not impose an impermissible burden on the plaintiffs' exercise of their rights as guaranteed by either the Federal or State Constitutions, or the Virginia Act for Religious Freedom. Thus, the court denies the plaintiffs' motion for summary judgment and grants the defendants' cross motion for summary judgment. An appropriate order shall this day issue.

ORDER

For the reasons set forth in the accompanying memorandum opinion, it is hereby

---

**10.** The court notes that the plaintiffs have not identified a religious practice which is infringed by the Board's Guidelines. Apparently the plaintiffs contend that publishing a religious magazine is itself a religious practice.

**11.** The court also notes that with few exceptions, *Sherbert* has been limited to those cases involving the denial of unemployment compensation benefits. *See Smith, supra,* 494 U.S. at 883, 110 S.Ct. at 1602.

ADJUDGED AND ORDERED that:

1. The plaintiffs' motion for summary judgment is denied;

2. The defendants' cross motion for summary judgment is granted.

This case shall be dismissed and stricken from the docket of the court. The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record.