Ronald W. ROSENBERGER, as a member of Wide Awake Productions; Wide Awake Productions; Wide Awake Magazine; Gregory W. Mourad; Robert J. Prince, Plaintiffs–Appellants,

v.

The RECTOR AND VISITORS OF the UNIVERSITY OF VIRGINIA; Edward E. Elson; W.L. Lyons Brown, Jr.; Robert G. Butcher, Jr.; N. Thomas Connally; Hovey S. Dabney; Waller H. Horsley; J. Thomas Hulvey; Evans B. Jessee; Patricia M. Kluge; Arnold H. Leon; Leigh B. Middleditch, Jr.; Elizabeth D. Morie; Freddie W. Nicholas, Sr.; S. Buford Scott; Jesse B. Wilson, III; Thomas E. Worrell, Jr.; Adam S. Arthur; Alexander G. Gilliam, Jr.; Ronald J. Stump, Defendants–Appellees.

No. 92–1736.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 30, 1992.

Decided March 14, 1994.

**270**

**ARGUED:** Michael William McConnell, Mayer, Brown & Platt, Chicago, Illinois, for appellants. James John Mingle, University General Counsel and Special Assistant Attorney General, University of Virginia, Charlottesville, VA, for appellees.

**ON BRIEF:** Michael P. McDonald, Center for Individual Rights, Washington, D.C., for appellants. Paul J. Forch, Senior Assistant Attorney General, Caroline L. Lockerby, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for appellees.

Before ERVIN, Chief Judge, WILLIAMS, Circuit Judge, and SPROUSE, Senior Circuit Judge.

## OPINION

ERVIN, Chief Judge:

We must decide whether a state university's refusal to disburse monies from its student activities fund for the benefit of a student-run religious publication violates the First and Fourteenth Amendments to the Constitution. We hold that it does not.

I

A

The University of Virginia collects a mandatory student activities fee of fourteen dollars per semester, together with tuition payments, from each of its full-time students. The proceeds of the collection are deposited in the University's Student Activities Fund ("SAF"), which is used to support the wide variety of student organizations, activities, and publications that function at the University.

To qualify for student-activity-fee funds, a student group first must attain the status of a "Contracted Independent Organization" ("CIO") at the University. CIO status is available to any group that is composed in its majority of students, is managed by officers who are full-time students, keeps an updated copy of its constitution on file with the University, and signs an anti-discrimination disclaimer. CIOs are given access to University facilities, including meeting rooms and computer terminals, as well as the right to apply for student-activity-fee funds. The standard CIO agreement executed between qualified student groups and the University states that benefits provided to the groups by the University

> should not be misinterpreted as meaning that those organizations are part of or controlled by the University, that the University is responsible for the organizations'

contracts or other acts or omissions, or that the University approves of the organizations' goals or activities.

As the corporate body responsible under state law for governing the institution,[1] the Rector and Visitors of the University of Virginia ("Rector and Visitors") wield ultimate decisionmaking power over the operation of the SAF. The Rector and Visitors have delegated responsibility for allocating SAF monies to the University's Student Council. A CIO seeking an SAF grant must submit a detailed application for funding to the Appropriations Committee, a subcommittee of the full Student Council, which approves or denies the request. Appeal from a denial of funding by the Appropriations Committee may be taken to the full Student Council. Upon the Council's affirmance of the Appropriations Committee's decision, a second appeal may be argued before the University's Student Activities Committee, a faculty body chaired by a designee of the Vice President for Student Affairs.

The decisions of each of these authorities with respect to awards of SAF monies must be taken in compliance with certain guidelines promulgated by the Rector and Visitors. These guidelines, adopted in 1970, charge the Student Council with administering the SAF "in a manner consistent with the educational purpose of the University as well as with State and Federal law." The guidelines prohibit several categories of student organizations from obtaining SAF funds, according to the nature of the organization and the purpose for which the funds would be used. Although they may attain CIO status, fraternities and sororities, political and religious organizations, and groups whose membership policies are exclusionary in nature

are ineligible for SAF funding. The following expenditures and activities also are excluded by the guidelines: (1) honoraria or similar fees; (2) religious activities; (3) social entertainment and related expenses; (4) philanthropic contributions and activities; and (5) political activities.[2]

Once a student organization attains CIO status and becomes eligible for funding, the guidelines prescribe the following criteria for allocating SAF monies among CIOs: (1) the size of the group; (2) the University-wide benefits conferred by the group's activities; and (3) the group's financial self-sufficiency. After a student organization is approved for funding, it submits expense vouchers to the SAF, which are paid only upon a determination that a particular expense is fundable under the guidelines. SAF monies are not paid to the group, but are disbursed directly to the group's creditors to discharge the fundable expense.

For the academic year 1990–91, 343 student organizations qualified as CIOs. Of these 343 groups, 135 applied for SAF funding, and 118 were awarded SAF monies. Numbered among the funded organizations were fifteen student publications;[3] also included were the Muslim Students Association, the Jewish Law Students Association, and the C.S. Lewis Society.

### B

In September 1990 Ronald W. Rosenberger, an undergraduate at the University, joined with other University students to found Wide Awake Productions. According to its constitution, Wide Awake Productions is an unincorporated association with the stated purposes of (1) "publishing a magazine

1. *See* Va.Code Ann. §§ 23–69 to –85 (Michie 1985 & Supp.1993) (delegating to the Rector and Visitors responsibility for governing the affairs of the University, and setting forth procedures and policies for the execution of this duty).

2. This case involves a challenge to the University's refusal to fund a student organization engaged in religious expression. Accordingly, we note that the guidelines offer definitions of the phrases "religious organization" and "religious activity." A "religious organization" is defined as "an organization whose purpose is to practice a devotion to an acknowledged ultimate reality

or deity." The guidelines define a "religious activity" as "an activity which primarily promotes or manifests a particular belief(s) in or about a deity or an ultimate reality."

3. These included, *inter alia, Declaration, Dialogue Magazine,* the *Journal of Law and Politics, Loki Science Magazine, Oculus, Seasons, Thoughtlines,* the *University Journal,* the *Virginia Advocate,* the *Virginia Environmental Law Journal,* the *Virginia Literary Review,* and the *Yellow Journal.*

of philosophical and religious expression"; (2) "facilitating discussion which fosters an atmosphere of sensitivity to and tolerance of Christian viewpoints"; and (3) "providing a unifying focus for Christians of multicultural backgrounds." Wide Awake Productions publishes *Wide Awake: A Christian Perspective at the University of Virginia* ("*Wide Awake*"), a nonprofit journal written and edited by the student members of Wide Awake Productions. As stated by Rosenberger, who serves as editor-in-chief of *Wide Awake*, the journal[4] was launched when the members of Wide Awake Productions "realized that none of the fifteen student-run publications at the University provided a forum for Christian expression," and decided to fill this perceived void. *See* "Letter from the Editor," *Wide Awake: A Christian Perspective at the University of Virginia,* Nov.–Dec. 1990, at 2. *Wide Awake* and Wide Awake Productions are not affiliated with any religious institution, and allow any University student to join without regard to sex, race, religion, or color.

At the time notice of the instant appeal was filed, three issues of *Wide Awake* had been published, with approximately 5,000 copies of each issue being distributed free of charge to persons on the University campus. According to editor Rosenberger's comments in the first issue, *Wide Awake*'s mission is twofold: "to challenge Christians to live, in word and deed, according to the faith they proclaim[,] and to encourage students to consider what a personal relationship with Jesus Christ means." *Id.* In furtherance of this mission, *Wide Awake* "offers a Christian perspective on both personal and community issues, especially those relevant to college students at the University of Virginia." *Id.*

The content of the three issues of *Wide Awake* published thus far forms part of the record in this case. The first issue's cover story, "Eracing Mistakes," offered Christian solutions for the enduring calamity of racism, *see id.* at 1, 12–14; other articles treated such diverse issues as "crisis pregnancy," Oxford Christian apologeticist C.S. Lewis's ideas about evil and free will, "beating stress," and "praying with a thankful heart," all written from an avowedly Christian stance. *See id.* at 4–5, 6–8, 15, 21. The featured contribution in the second issue, "Out of the Closet and Into the Light," addressed the question "How should the Church respond to homosexuals ... and vice versa?" *See id.,* Mar./Apr.1991, at 1, 14–17. The second issue also included an interview with a Christian professor of mathematics at the University, an article on Christian missionary work throughout the world, and two commentaries offering spiritual guidance (titled respectively "God's Word: A Spiritual Advantage," and "On Your Own: Hope and Spirit"). *See id.* at 5–7, 11–13, 20–21. The third issue contained articles about a University graduate's experiences as a missionary in Moldavia, eating disorders (titled "From Calorie to Calvary"), and a Christian musician ("Keith Green: Piano Man for Christ"). *See id.,* Sept.–Oct. 1991, at 5–7, 12–14, 18–20. Columns in all three issues reviewed newly released recordings of music of religious disposition.[5]

---

4. We note that the editors of *Wide Awake* would reject our use of the noun "journal" to describe their publication:

We ... chose to call our magazine a perspective instead of a journal or viewpoint. The word perspective embraces the idea of viewing a situation from a particular angle (in this case a Christian angle), rather than viewing a situation with a particular conclusion in mind (as a politically partisan magazine would do). Our perspective is a starting point, not a finish line.

*Wide Awake: A Christian Perspective at the University of Virginia* [hereinafter *Wide Awake*], Mar.–Apr. 1991, at 4. We employ the nomenclature "journal" herein not to cast doubt upon the editors' preference, but purely as a generic appellation; thus, for our purposes a "journal" is simply "[a] periodical containing articles of interest to a particular group....," *Webster's II New Riverside University Dictionary* 656 (1988); "a periodical publication dealing with matters of current interest....," *Webster's Third New International Dictionary* 1221 (1976). This usage comports with the editors' own description of *Wide Awake* as "a collection of articles exploring from within a Christian framework various issues, both of widespread general interest and of particular interest to Christians." *Wide Awake,* Mar./Apr. 1991, at 4.

5. *See* Michelle Carpick, "All Aboard," *in Wide Awake,* Nov.–Dec. 1990, at 16–17 (reviewing Annie Herring's album *Waiting for My Ride to Come*); Michelle Carpick, "Heart Toward Heaven," *Wide Awake,* Sept.–Oct. 1991, at 21 (reviewing Kim Hill's album *Brave Heart*); Fred Hop-

The plaintiffs do not dispute that in publishing *Wide Awake* they are engaged in a "religious activit[y]" as the SAF guidelines define the phrase.[6] Indeed, after reading its contents dispassionately, we are compelled to mark *Wide Awake*'s unflagging[7] invocation of religious, specifically Christian, themes. The journal's pages are pervasively devoted to providing a "Christian perspective" in printer's ink at the University of Virginia. *Wide Awake*'s editorial stance extends to its advertising sales: by the public release of the third issue represented in the record (dated September/October 1991), roughly eighty percent of the journal's five commercial and notice columns were given over to Christian churches or to business entities purveying goods and services of Christian bent.[8] Even *Wide Awake*'s physical appearance draws attention to its religious posture: the Christian symbol of the Cross, lying in a dark oval field, is printed at the top of each page; another Cross marks the end of each contribution.

Wide Awake Productions attained CIO status shortly after its founding. Commensurate with this status, as the plaintiffs acknowledge, the University openly accords Wide Awake Productions the same access to University facilities as other CIOs. Such access includes the use of University property for the group's meetings, functions, and programs. CIO status affords the members of Wide Awake Productions liberal recourse to University computer terminals, printers, and other equipment employed in the preparation of manuscripts for publication.

In January 1991, Ronald W. Rosenberger, on behalf of Wide Awake Productions, submitted an application for SAF funding to the Appropriations Committee of the Student Council in the amount of $5,862.00, to cover publishing costs for *Wide Awake*. On February 26 of that year the Appropriations Committee denied Rosenberger's application, stating:

> In reviewing the request by Wide Awake Productions, the ... Committee determined your organization's request could not be funded as it is a religious activity. This determination was made after reviewing your first issue of *Wide Awake*. In particular, the committee noted in your Editor's Letter that the publication was "a forum for Christian expression" and a means "to challenge Christians (in how) to live"....
>
> Please be aware that this decision simply denies Student Activity Fee funding for your publication. Wide Awake Productions may still print and distribute issues on Grounds.[9]

The members of Wide Awake Productions promptly appealed the decision to the full Student Council on March 3, 1991, contending that their organization had satisfied all applicable SAF funding guidelines and that the Appropriations Committee's denial of funding violated the Constitution of the United States. The Student Council affirmed the Appropriations Committee's decision without comment.

---

kins, "A Choice Cut," *Wide Awake*, Mar.–Apr. 1991, at 19 (reviewing *Chosen*, a newly released album by the "alternative" rock band The Violet Burning).

**6.** *See supra* note 2.

**7.** Careful perusal of *Wide Awake*'s three published issues suggests one exception to this generalization: a contribution titled "The Economics of Compassion," which examined Pope John Paul II's 1991 encyclical *Centesimus Annus*. The article discusses in a nondidactic manner the encyclical's "ringing denunciation of socialism" and its "support of the free market." *See* Greg Mourad, "The Economics of Compassion," *Wide Awake*, Sept.–Oct. 1991, at 8–11.

**8.** These included notices and advertisements for the Christian Fellowship Church in Vienna, Virginia (noting times of scheduled Sunday services); The Christian Bookstore in Charlottesville, Virginia (promoting sales of the *NIV Study Bible*); The Center for Christian Study (location unspecified) (inviting full-time University of Virginia students to attend free of charge a weekly lecture and discussion series titled "Thinking Christianly"); and Trinity Presbyterian Church (location unspecified) (noting times of scheduled Sunday services). *See Wide Awake*, Sept./Oct. 1991, at 4, 10, 11, 21.

**9.** The letter communicating the Appropriations Committee's decision to Rosenberger was sent over the signature of Cynthia J. Wilbricht, the Student Council's Vice President for Student Organizations.

Wide Awake Productions then appealed the Student Council's ruling to the University's Student Activities Committee. On April 16, 1991, Associate Dean of Students Ronald J. Stump informed Rosenberger of the Student Activities Committee's decision to affirm the funding denial. Stump wrote:

After reviewing your organization's constitution, copies of the magazine's first two editions, and the arguments presented at last week's appeal by Wide Awake Productions and by [the] Student Council, the Committee determined that the Wide Awake magazine could not be funded as it is a religious activity. In effect, the Student Activities Committee fully supports the decision and reasoning provided to you in the February 26 letter from [the Appropriations Committee]. As noted in [that] letter, Wide Awake Productions may still print and distribute copies of the magazine and as a CIO has full and equal access to other University facilities and services.

The Student Activities Committee's repudiation exhausted all internal avenues of appeal within the University for the institution's denial of SAF funding to Wide Awake Productions.

C

On July 11, 1991, the members of Wide Awake Productions brought this action against the Rector and Visitors and Dean Stump pursuant to 42 U.S.C. § 1983.[10] The plaintiffs' complaint set forth three challenges to the SAF guidelines' exclusion of "religious activities," including the publica-

tion of *Wide Awake,* from eligibility for funding consideration, each predicated upon provisions of the Constitution of the United States. To each of the plaintiffs' federal constitutional claims were appended alternative and supplemental claims seeking recovery under the provisions of Article I of the Constitution of Virginia[11] and, in the case of Count Two, under the Virginia Act for Religious Freedom, Va.Code Ann. §§ 57–1 to –2 (Michie 1985 & Supp.1993). The plaintiffs did not challenge directly the University's refusal to fund Wide Awake Productions, except insofar as the adverse funding decisions flowed directly from the requirements of the guidelines themselves.[12]

Count One, the complaint's most comprehensive theory of recovery, alleged that the guidelines' proscription of SAF funding for the publication costs of *Wide Awake* violated the Free Speech and Press Clause of the First Amendment to the United States Constitution[13] and Article I, Section 12 of the Virginia Constitution[14] (1) by unlawfully depriving the members of Wide Awake Productions of government benefits solely because of the content and viewpoint of their speech in *Wide Awake;* and (2) by illegally excluding the members of Wide Awake Productions from the "limited public forum" created by the Rector and Visitors' establishment of the SAF and promulgation of the funding guidelines. Count One also contended that the guidelines' "definitions for allocating SAF funds to CIOs" are unconstitutionally vague because persons of ordinary intelligence must guess at their meaning, and unlawfully

10. 42 U.S.C. § 1983 reads in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

11. Article I of the Virginia Constitution comprises that charter's Declaration of Rights. *See* Va. Const. pmbl.; I A.E. Dick Howard, *Commentaries on the Constitution of Virginia* 27–313 (1974).

12. The complaint did not challenge any of the University's procedures for administering the SAF, nor the discretionary authority vested by the Rector and Visitors in official student and University governing bodies with respect to SAF funding decisions.

13. *See* U.S. Const. amend. I, cl. 3 ("Congress shall make no law ... abridging the freedom of speech, or of the press"....).

14. Article I, Section 12 of the Virginia Constitution provides *inter alia* that "any citizen may freely speak, write, and publish his sentiments on all subjects," and that "the General Assembly shall not pass any law abridging the freedom of speech or of the press...." Va. Const. art. I, § 12, cls. 2, 3.

overbroad because they impinge constitutionally protected activity.

Count Two of the complaint maintained that the guidelines' denial of SAF funding to "religious activities" violated the Free Exercise Clause of the First Amendment to the Federal Constitution,[15] Article I, Section 16 of the Virginia Constitution,[16] and the Virginia Act for Religious Freedom, Va.Code Ann. §§ 57–1 to –2 (Michie 1985 & Supp.1993),[17] by discriminating in the granting of a government benefit based upon (1) the religious content of the expression in *Wide* Awake; and (2) the religious beliefs, character, or affiliation of the members of Wide Awake Productions. Count Two also imputed to the Rector and Visitors "conduct constitut[ing] a failure to give reasonable accommodation to the plaintiffs' religious beliefs."

Count Three of the complaint alleged that the guidelines' prohibition against subsidizing "religious activit[ies]," coupled with the Rector and Visitors' denial of SAF funds to Wide Awake Productions, violated the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution[18] and the Anti–Discrimination Clause of Article I, Section 11 of the Virginia Constitution.[19] Specifically, Count Three contended (1) that the guidelines "den[ied] plaintiffs the benefits to which other students and CIOs are entitled" by unconstitutionally discriminating against Wide Awake Productions on the basis of the content or viewpoint of its members' speech and association; and (2) that the guidelines unconstitutionally discriminated against the plaintiffs' religious speech "by denying [them] the benefits that other students and CIOs engaged in religious speech and activities receive and have received...." This viewpoint- and religious-based discrimination, Count Three maintained, was not justified by a compelling state interest, nor was it narrowly tailored to achieve whatever minimal interest the Rector and Visitors may have in refusing to fund student "religious activit[ies]."

The plaintiffs sought redress for their alleged injuries in the form of (1) a declaratory judgment that the guidelines' prohibition against the funding of "religious activities" violated their rights under the United States Constitution, the Virginia Constitution, and the Virginia Act for Religious Freedom; (2) a permanent order enjoining the Rector and Visitors from promulgating any proscription against the funding of Wide Awake Productions on the basis of the content or viewpoint of its members' speech in *Wide Awake;* (3) compensatory damages of at least $5,862.00, the sum of SAF funds unconstitutionally denied Wide Awake Productions; and (4) an order awarding Wide Awake Productions reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.[20]

**15.** *See* U.S. Const. amend. I, cl. 2 ("Congress shall make no law ... prohibiting the free exercise [of religion]"....).

**16.** Article I, Section 16 of the Virginia Constitution provides *inter alia* that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience," and that the Virginia General Assembly "shall not ... confer any peculiar privileges or advantages on any sect or denomination...." Va. Const. art. I, § 16, cls. 2, 6.

**17.** After a lengthy preamble denouncing those who would force their religion upon others, the Virginia Act for Religious Freedom provides in pertinent part:

"Be it enacted by the General Assembly, That no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened, in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinions in matters of religion, and that the same shall in no wise diminish, enlarge or affect their civil capacities."
Va.Code Ann. § 57–1 (Michie 1985 & Supp. 1993).

**18.** *See* U.S. Const. amend. XIV, § 1, cl. 4 ("No State shall ... deny to any person within its jurisdiction the equal protection of the laws.").

**19.** Article I, Section 11 of the Virginia Constitution, provides *inter alia* "[t]hat the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged, except that the mere separation of the sexes shall not be considered discrimination." Va. Const. art. I, § 11, cl. 3.

**20.** 42 U.S.C. § 1988 provides that
[i]n any action or proceeding to enforce a provision of section[ ] ... 1983 ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
*Id.*

Agreeing that there were no material facts at issue, both parties sought summary judgment as a matter of law. After hearing oral argument on their opposing motions, the district court granted summary judgment in favor of the Rector and Visitors on each count of the plaintiffs' complaint, concluding (1) that the SAF was not a "limited public forum;" (2) that application of the funding guidelines did not result in viewpoint or content discrimination against the speech of Wide Awake Productions; and (3) that the denial of funding did not burden the plaintiffs' free exercise of religion. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 795 F.Supp. 175, 178–83 (W.D.Va.1992) (mem.). The court also held that the plaintiffs' equal protection challenge to the guidelines failed because the members of Wide Awake Productions had not adduced evidence of the Rector and Visitors' discriminatory intent. Although the district court did not scrutinize the complaint's allegations that the guidelines violated the Virginia Constitution and the Virginia Act for Religious Freedom, it held that the restrictions on funding for "religious activities" did not "impose an impermissible burden on the plaintiffs' exercise of their rights as guaranteed by ... the State Constitution[ ], or the Virginia Act for Religious Freedom." *Id.* at 17.

This appeal followed.

## II

■ Before addressing the substance of the plaintiffs' assignments of error, we wish to make clear what precisely is at issue in this appeal. The complaint alleges that the Rector and Visitors have violated rights guaranteed the plaintiffs by the Constitution of the United States, the Constitution of Virginia, and the Virginia Act for Religious Freedom. Two of these sources derive from the substantive law of the Commonwealth of Virginia. As such, they comprise fonts of individual liberties independent of the Feder-

al Constitution, and are therefore susceptible of autonomous interpretation by the courts of the Commonwealth.[21] Although the district court embraced these pendent state-law claims in its favorable grant of summary judgment to the Rector and Visitors,[22] they were not controverted by the parties at the summary judgment hearing, and were not subjected to independent scrutiny on their merits below. We have no objective basis, therefore, upon which to assume that any interpretation of the Virginia Constitution or the Virginia Act for Religious Freedom contributed separately to the judgment from which this appeal was taken. The parties have not attempted to resuscitate them in their briefs or at oral argument. To bring grounds for relief to the attention of an appellate tribunal, the Federal Rules of Appellate Procedure oblige the parties to offer a written

> argument ... contain[ing] [their] contentions ... with respect to the issues presented, and the reasons therefor, with citations to the authorities ... and parts of the record relied on.

Fed.R.App.P. 28(a)(5), (b). We observe that none of the briefs filed by either party in this court contains "contentions" about the application of the Virginia Constitution's Declaration of Rights or the Virginia Act for Religious Freedom to the instant case, or "citations to ... authorities" that might illuminate the special rights the state charter and religious-freedom statute are said to guarantee. We therefore are compelled to conclude that the parties have failed to appeal the district court's grant of summary judgment with respect to these state-law theories of recovery. Failure of this nature constitutes abandonment of the claims, and precludes us from considering them further herein. *See Shopco Distrib. Co. v. Commanding Gen.*, 885 F.2d 167, 170 n. 3 (4th Cir.1989) (noting that failure to comply with terms of former version of Fed.R.App.P. 28(a)(5) constitutes waiver of asserted claims).

---

**21.** *See, e.g.,* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489, 491, 498–504 (1977).

**22.** *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 795 F.Supp. 175, 183 (W.D.Va.1992) (mem.)

(holding that funding restrictions on "religious activities" do not impermissibly burden rights guaranteed by the Constitution of Virginia or the Virginia Act for Religious Freedom).

Therefore, the scope of our inquiry is confined to such of the plaintiffs' assignments of error as rest upon the Constitution of the United States. These are two.[23] First, the plaintiffs contend that the guidelines' proscription of SAF funding for "religious activities" violates the Free Speech and Press Clause of the First Amendment (1) by depriving them of government benefits based solely on the content and viewpoint of their speech in *Wide Awake,* and (2) by excluding them from the "limited public forum" represented by the SAF. Second, the plaintiffs argue that the guidelines' funding restrictions discriminate against them in contravention of the Equal Protection Clause of the Fourteenth Amendment (1) by denying them benefits which other CIOs engaged in religious speech and activities have received, and (2) because the restrictions serve no compelling state interest, and are not narrowly tailored to satisfy whatever minimal interest the Rector and Visitors may have in denying funding to "religious activit[ies]." In the discussion that follows, we address these two claims in turn, reviewing the legal conclusions on which the district court granted summary judgment *de novo. See, e.g., Brock v. Entre Computer Ctrs., Inc.,* 933 F.2d 1253, 1259 (4th Cir.1991).

### III

First, we examine the plaintiffs' contention that the guidelines' proscription of SAF funding for "religious activities" violates the Free Speech and Press Clause of the First Amendment by depriving the members of Wide Awake Productions of government benefits based solely on the content and viewpoint of their speech in *Wide Awake.*

### A

Because our decision rests ultimately upon our understanding of the language of the First Amendment, we here undertake cursory review of certain principles of constitutional interpretation that guide our deliberations.

Like their cultural and ideological ancestors the Magna Carta (1215) and the English Bill of Rights (1688), the first ten amendments to the Federal Constitution represent what Justice Story called "a solemn recognition of limitations upon the power of parliament; that is, a declaration, that parliament *ought* not to abolish, or restrict" certain fundamental rights of the person. III Joseph Story, *Commentaries on the Constitution of the United States* § 980, at 695 (1833). Taken as a whole, the provisions of the Bill of Rights form a stout bulwark against government encroachment upon the fundamental liberties of every person within the jurisdiction of the United States. The amendments weigh as a counterpoise to the specifically enumerated powers granted by the people of the several states to their national government in the first three Articles of the Federal Constitution.

By its terms the Free Speech and Press Clause of the First Amendment reflects the limiting purpose of the Bill of Rights. The Clause pronounces the federal legislature's impotence to curb any individual's freedom to express verbally her views upon any subject; it states that Congress shall "make *no* law ... *abridging* the freedom of speech, or of the press." U.S. Const. amend. I, cl. 3 (emphasis added). While the First Amendment thus represents a guarantee that freedom will be preserved in the face of legislative ambition, it goes no further. Although the Amendment preserves inviolate the individual's *right* to speak, it sustains speech itself only indirectly. The Speech and Press Clause cannot be metamorphosed into a promise that the federal government will purchase a bullhorn, paper, and ink for the convenience of every garrulous member of the American populace. The Constitution does not guarantee the American people the means of self-expression; it simply pledges that Congress (and, through application of

**23.** In granting the University's motion for summary judgment, the district court ruled that the denial of funding to Wide Awake Productions did not unconstitutionally burden the plaintiffs' free exercise of religion. *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 795 F.Supp. 175, 178–83 (W.D.Va.1992) (mem.). Because the plaintiffs failed to assign error to this holding on appeal, it meets the same fate as the plaintiffs' state-law claims: we consider it abandoned, and decline to address it herein. *See* Fed.R.App.P. 28(a)(5); *Shopco Distrib. Co.,* 885 F.2d at 170 n. 3.

the Fourteenth Amendment, the states [24]) will not enact laws or regulations restraining at its inception a person's right freely to speak her views and to disseminate them by every means at her disposal. A century and six decades after the publication of his commentaries on our national charter, Justice Story's expression of this principle retains all its peerless power:

> That this amendment was intended to secure to every citizen an absolute right to speak, or write, or print, whatever he might please, without any responsibility, public or private, therefor, is a supposition too wild to be indulged by any rational man.... It is plain, then, that the language of the amendment imports no more, than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without prior restraint....

Story, *supra*, § 993, at 703–04.

## B

With these interpretative precepts firmly in hand, we turn to the assignment of error lodged by the plaintiffs.

The plaintiffs do not suggest that the Rector and Visitors have restrained them from speaking, writing, or printing commentary upon religious themes, or indeed upon any other subject, on the campus or within the purview of the University of Virginia. As they freely admit, Wide Awake Productions is afforded the full benefits of CIO status by the University. Its members are granted the same access to meeting rooms on University grounds as other CIOs, and are given generous run of University property for their work and programs. The University affords Wide Awake Productions liberal recourse to its computer terminals, printers, and other equipment used to prepare manuscripts for publication. With the University's full consent, the plaintiffs have thus far distributed several thousand copies of *Wide Awake* on University grounds. The plaintiffs do not, indeed cannot, suggest, therefore, that the Rector and Visitors have placed a per se unconstitutional prior restraint upon their freedom actually to speak or to publish their views by denying them equal access to University facilities. *Cf. Widmar v. Vincent,* 454 U.S. 263, 277, 102 S.Ct. 269, 278, 70 L.Ed.2d 440 (1981) (discussing erection of prior restraint against student organization's use of state university property); *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972) (same).

■ Nor is the plaintiffs' complaint simply that the Rector and Visitors have refused to pay for the publication of their speech with treasure from the University fisc. If such were the nature of this dispute, we might leave the field of independent analysis fallow. For there is no question that the Commonwealth of Virginia, like any private owner of property, may preserve the land and chattels under its control for the use to which they are dedicated, and decline to lend them for other purposes. *E.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* —— U.S. ——, ——, 113 S.Ct. 2141, 2146, 124 L.Ed.2d 352 (1993); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3447–3448, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). As agents of the Commonwealth, the Rector and Visitors need not subsidize extracurricular student activities in any form. *Healy v. James,* 408 U.S. 169, 182 n. 8, 92 S.Ct. 2338, 2346 n. 8, 33 L.Ed.2d 266 (1972). Having undertaken such subsidies, they need not have promulgated criteria by which the Student Council could differentiate between competing funding requests. Nor are the Rector and Visitors under any affirmative obligation to ensure that University students' expres-

---

**24.** The Due Process Clause of the Fourteenth Amendment has been held to protect from infringement by the states all of the First Amendment liberties potentially at issue in this case: the freedoms of speech, *Fiske v. Kansas,* 274 U.S. 380, 387, 47 S.Ct. 655, 657, 71 L.Ed. 1108 (1927); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629–30, 69 L.Ed. 1138 (1925); press, *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 722–23, 51 S.Ct. 625, 633–34, 75 L.Ed. 1357 (1931); free exercise of religion, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); and non-establishment of religion, *Everson v. Board of Educ.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–512, 91 L.Ed. 711 (1947).

sive activities are funded. In language redolent of Justice Story's pointed commentary on the Speech and Press Clause, the Supreme Court has rejected the notion that the rights of freedom of speech and freedom of the press "are somehow not fully realized unless they are subsidized by the state." *Regan v. Taxation with Representation,* 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983).

The Student Council's exercise of discretion in withholding SAF monies from Wide Awake Productions is not, therefore, the basis of the plaintiffs' complaint. The plaintiffs contend, instead, that once the Rector and Visitors have chosen to promulgate guidelines governing the allocation of funds that support student speech among competing student interests, such guidelines cannot condition funding awards on the content or viewpoint of a prospective recipient's speech. The Rector and Visitors have violated the First Amendment, the plaintiffs maintain, by denying them the benefit of a University-funded SAF grant on grounds that their publication of *Wide Awake* constitutes a "religious activit[y]" [25] within the meaning of the guidelines. Such discrimination contravenes the First Amendment, they assert, because it implicitly condemns the content and viewpoint of their speech in *Wide Awake.* This content and viewpoint discrimination imposes a prior restraint upon the ability of Wide Awake Productions to enjoy government largesse, and, the plaintiffs contend, must therefore be struck down.

### C

Having identified the constitutional character of the plaintiffs' first assignment of error, we proceed to seek its resolution.

■ The notion that, whenever a government benefit or privilege might be withheld altogether, it may be withheld on whatever conditions government chooses to impose, has been thoroughly repudiated by the Supreme Court since the middle of this century. *See, e.g., Sherbert v. Verner,* 374 U.S. 398, 405, 83 S.Ct. 1790, 1794–1795, 10 L.Ed.2d 965 (1963); *Speiser v. Randall,* 357 U.S. 513, 518, 526, 78 S.Ct. 1332, 1338, 1342, 2 L.Ed.2d 1460 (1958); *see also* Laurence H. Tribe, *American Constitutional Law* § 11–5, at 781–84 (2d ed. 1988) (discussing "elusive" distinction between withholding a government subsidy for and imposing a penalty upon exercise of a constitutional right). Unconstitutional conditions, which make enjoyment of a government benefit contingent on sacrifice of an independent constitutional right, are *prima facie* invalid. For

> if the government could deny a benefit to a person because of his constitutionally protected speech ..., his exercise of th[at] freedom[ ] would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (quoting *Speiser,* 357 U.S. at 526, 78 S.Ct. at 1342). Whether a condition is unconstitutional depends on whether the government may properly demand sacrifice of the particular right asserted in the context of its exercise. *FCC v. League of Women Voters,* 468 U.S. 364, 380, 395, 104 S.Ct. 3106, 3117, 3125, 82 L.Ed.2d 278 (1984).

We must decide whether the guidelines' prohibition against funding "religious activi-

---

**25.** The guidelines draw a distinction between "religious organizations" and "religious activities." "Religious organizations" are student groups whose whole or primary purpose is to practice devotion to an ultimate reality or deity; such groups are wholly barred from receiving SAF funds. "Religious activities," on the other hand, are forms of conduct or behavior that cannot, commensurate with the guidelines, be subsidized with SAF monies. The result of the guidelines' identification of these two categories, however, is the total proscription of SAF funding for all forms of religious endeavor by CIOs at the University.

When the Student Council's Appropriations Committee, and later the Student Activities Committee, informed Ronald W. Rosenberger that Wide Awake Productions would not be the recipient of SAF funds, they referred to the publication of *Wide Awake* as a "religious activity." It has not been suggested that the defendants rejected the funding request because Wide Awake Productions constitutes a "religious organization." Hence we assume with the parties that the denial of funding rested on a determination that *Wide Awake* was "an activity ... primarily promot[ing] or manifest[ing] a particular belief(s) in or about a deity or an ultimate reality."

ties" imposes an unconstitutional condition upon receipt of the government benefit inherent in an award of SAF monies by infringing the plaintiffs' claimed First Amendment right to indulge religious expression. This decision harbors a two-part inquiry. First, we must determine whether the publication of *Wide Awake* constitutes "speech" protected by the Speech and Press Clause of the First Amendment. If we so decide, we then must ask whether the Rector and Visitors are imposing an unconstitutional condition upon the exercise of the plaintiffs' protected speech; that is, we must determine whether the Rector and Visitors are demanding that the members of Wide Awake Productions cease publishing religious speech in *Wide Awake* before they may become eligible[26] for an award of SAF funds.

1.

With respect to the first part of this inquiry, we easily conclude that the plaintiffs' publication of religious speech in *Wide Awake* falls within the protective ambit of the Speech and Press Clause. There is no question that discussions of religion are, as they long have been, a form of speech protected by the First Amendment. *See, e.g., Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563–2564, 69 L.Ed.2d 298 (1981); *Saia v. New York,* 334 U.S. 558, 561–62, 68 S.Ct. 1148, 1150–51, 92 L.Ed. 1574 (1948). Although the Rector and Visitors' prohibition of SAF funding for "religious activities" is not directed exclusively at religious *speech,* the phrase "religious activit[y]" as defined in the guidelines necessarily encompasses speech that "primarily promotes or manifests a particular belief[ ] in or about a deity or an

ultimate reality." The word "activity" is defined as "an occupation, pursuit, or recreation in which a person is active," *Webster's Third New International Dictionary* 22 (1976).

There can be no doubt that the publication of a journal of religious expression is precisely such an occupation, pursuit, or recreation.

2.

Having answered the first prong of the inquiry affirmatively, we address the second prong: Have the Rector and Visitors effectively demanded that the members of Wide Awake Productions cease publishing religious commentary in Wide Awake before they may become "eligible" for an award of SAF funds? We conclude that they have.

The guidelines lay upon the Student Council an affirmative obligation not to fund "religious activit[ies]." This obligation means that religious expression, such as that in *Wide Awake,* is never allowed to compete for funds with other forms of speech that might be indulged by University students. Even if a student organization achieves CIO status, to the extent that its pursuits and functions consist of religious speech, the organization's funding requests will be summarily rejected by the Student Council. In effect, then, the Rector and Visitors' restriction has operated to erect a prior restraint on University subsidization of all forms of religious expression in which a CIO might engage. While we acknowledge that a CIO has no right to funding by the Rector and Visitors, *see, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* —— U.S. ——, ——, 113 S.Ct. 2141, 2146, 124 L.Ed.2d 352 (1993), when funds are made available to CIOs gen-

---

**26.** The parties wrangle at considerable length over the question whether Wide Awake Productions ever was "eligible" for SAF funding at all. The plaintiffs contend that attainment of CIO status by Wide Awake Productions made the organization "eligible" to receive SAF monies. The Rector and Visitors argue that Wide Awake Productions never was "eligible" for funding because its central purpose—publication of *Wide Awake*—constituted a "religious activity." We need not address the merits of these opposing positions, because we reject forthwith the Rector and Visitors' suggestion that they be given unlimited discretion to determine the "eligibility" of

student groups for SAF funding to the extent such discretion derogates the provisions of the Bill of Rights. The duty of upholding (and therefore of not wounding indirectly) the Federal Constitution devolves upon the Rector and Visitors as a matter of law; as agents of the Commonwealth of Virginia, the Rector and Visitors are bound to observe the strictures of the First Amendment, and may not issue regulations transgressing its bounds. As we note elsewhere herein, once SAF funds are made available to student groups at the University, they must be distributed in a viewpoint-neutral manner, absent the showing of a compelling state interest.

erally, they must be distributed in a viewpoint-neutral manner, absent considerations of equal constitutional dignity. *See Board of Educ. v. Mergens,* 496 U.S. 226, 248, 110 S.Ct. 2356, 2370–71, 110 L.Ed.2d 191 (1990) (plurality opinion); *Grand Rapids Sch. Dist. v. Ball,* 473 U.S. 373, 382, 105 S.Ct. 3216, 3221–22, 87 L.Ed.2d 267 (1985); *Roemer v. Board of Pub. Works,* 426 U.S. 736, 746, 96 S.Ct. 2337, 2344–45, 49 L.Ed.2d 179 (1976) (plurality opinion); *Everson v. Board of Educ.,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947). Although government need not subsidize exercise of a constitutional right, the lack of an affirmative duty of financial support does not mean that government may, in general, penalize exercise of constitutional rights by withholding from their possessors an otherwise discretionary benefit.

We conclude that the Rector and Visitors' erection of a prior restraint against University funding of such "religious activities" as the publication of religious expression in *Wide Awake* constitutes precisely such a penalty, because it restrains Wide Awake Productions from gaining access altogether to a funding source generally available to CIOs not engaged in religious expression.[27] This prior restraint ultimately forces the members of Wide Awake Productions—unlike their nonsectarian CIO colleagues—to seek financial sustenance for their speech from coffers outside the University. The Rector and Visitors' funding proscription thus creates an uneven playing field on which the advantage is tilted towards CIOs engaged in wholly secular modes of expression.

We hold, therefore, that the Rector and Visitors have conditioned the plaintiffs' receipt of government benefits upon their foregoing constitutionally protected religious expression.

### D

In reaching and forbidding funding for speech that meets the definition of "religious activity," but not for speech of other types, the SAF guidelines discriminate among speech on the basis of its content. *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 229–30, 107 S.Ct. 1722, 1727–28, 95 L.Ed.2d 209 (1987). In order to justify differential treatment of funding eligibility based on the content of the speech involved, "the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Id.* at 231, 107 S.Ct. at 1729; *see also Widmar v. Vincent,* 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981); *Carey v. Brown,* 447 U.S. 455, 461, 464–65, 100 S.Ct. 2286, 2290, 2292–93, 65 L.Ed.2d 263 (1980); *Healy v. James,* 408 U.S. 169, 184, 92 S.Ct. 2338, 2347–48, 33 L.Ed.2d 266 (1972). It is to this inquiry that we now turn.

In defense of the guidelines' prohibition, the Rector and Visitors claim a compelling interest in maintaining strict separation of church and state.[28] They derive this interest

---

**27.** We do not address the guidelines' prohibition of SAF funding for such organizations as fraternities and sororities or for such activities as social entertainment or philanthropic contributions. Those excluded categories are not at issue in the instant case. *See supra* note 2 and accompanying text.

**28.** In defense of their position, the Rector and Visitors cite a number of recent decisions by the Supreme Court; without exception, none of these cases are relevant to the question before us, and we find it unnecessary to discuss them at length. For thoroughness' sake, however, we observe that *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), on which the Rector and Visitors lay great emphasis, did not involve the erection of a prior restraint on abortion counseling by recipients of family planning funds under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 330a–6a. In *Rust,* regulations issued by the Secretary of

Health and Human Services simply limited the ability of Title X fund recipients to engage in abortion-related expressive activities. *Id.* at 176–77, 111 S.Ct. at 1764. Although, like the SAF funding restrictions at issue here, the regulations broadly prohibited Title X projects from engaging in activities that "encourage[d], promote[d] or advocate[d] abortion as a method of family planning," *id.* at 180, 111 S.Ct. at 1765, there was no question that the recipients were *recipients*—that is, that they already had received Title X funding. In his opinion for the Court, Chief Justice Rehnquist emphasized this distinction:

> Petitioners' reliance on [the Court's "unconstitutional conditions" cases] is unavailing ... because here the government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized.

*Id.* at 196, 111 S.Ct. at 1774. Thus, the issue in *Rust* was not—as here—whether the recipients

from the Establishment Clause of the First Amendment, which admonishes Congress (and, through application of the Fourteenth Amendment, the states [29]) to "make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. The Rector and Visitors argue that they cannot fund "religious activities" without violating the Establishment Clause.

■ We agree with the Rector and Visitors that their interest as state officials in complying with federal constitutional obligations, including avoiding the creation of an "establishment" of religion at the University of Virginia, may be characterized as compelling. *See Widmar*, 454 U.S. at 271, 102 S.Ct. at 275. It does not follow, however, that offering Wide Awake Productions an equal opportunity to compete for SAF funds necessarily would be incompatible with the Establishment Clause. *Id.*

That government largesse ultimately should redound to the benefit of persons engaged in promoting religion does not necessarily entail violation of the Establishment Clause. If such were the case, "a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair." *Id.* at 274–75, 102 S.Ct. at 277. Moreover, such an extreme position is plainly contrary to many of the Supreme Court's decisions upholding government aid to parochial elementary and secondary schools. *See, e.g., Zobrest v. Catalina Foothills Sch.*

*Dist.,* —— U.S. ——, ——–——, 113 S.Ct. 2462, 2466–67, 125 L.Ed.2d 1 (1993) (summarizing the Court's Establishment Clause jurisprudence with respect to government aid to parochial schools).

■ To test the Rector and Visitors' Establishment Clause justification for the guidelines' funding policy, then, we must consider whether awarding SAF monies to the members of Wide Awake Productions to defray the publication costs of *Wide Awake* would constitute an "establishment of religion" at the University of Virginia. In making this determination, we seek enlightenment in the Supreme Court's Establishment Clause jurisprudence. That jurisprudence holds that a governmental policy will not offend the Establishment Clause if it can pass constitutional muster under the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which guides "[t]he general nature of our inquiry in this area," *Mueller v. Allen*, 463 U.S. 388, 394, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983):

> First, the [governmental policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . ; finally, the [policy] must not foster an excessive government entanglement with religion.

*Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111–12.[30]

---

could obtain access to government benefits. It was, instead, whether the government could be allowed to dictate the use to which already-allocated funds could be dedicated.

29. *E.g., Everson v. Board of Educ.*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–512, 91 L.Ed. 711 (1947).

30. As we are well-aware, the Supreme Court's applications of *Lemon* have been characterized by fine distinctions, and have aroused considerable controversy among the Justices themselves, even to the point of frequent suggestion in non-majority opinions that *Lemon* be abandoned. We note, for example, Justice Scalia's recent denunciation of *Lemon:*

> Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children. . . .

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* —— U.S. ——, ——–——, 113 S.Ct. 2141, 2149–50, 124 L.Ed.2d 352 (Scalia, J., dissenting, joined by Kennedy, J.); *see also, e.g., Wallace v. Jaffree*, 472 U.S. 38, 68–69, 105 S.Ct. 2479, 2495–2497, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in judgment) (arguing that "the standards announced in *Lemon* should be reexamined and refined in order to make them more useful in achieving the underlying purpose of the First Amendment"); *id.* at 91, 105 S.Ct. at 2508 (White, J., dissenting) (urging "basic reconsideration of our precedents" surrounding the Establishment Clause); *id.* at 110, 105 S.Ct. at 2517 (Rehnquist, J., dissenting) (stating that the "*Lemon* test has no . . . grounding in the history of the First Amendment" and "has simply not provided adequate standards for deciding Establishment Clause cases").

Nevertheless, "*Lemon*, however frightening it might be to some, has not been overruled." *Lamb's Chapel,* —— U.S. at —— n. 7, 113 S.Ct. at

In the paragraphs that follow, we consider the Rector and Visitors' Establishment Clause justification for prohibiting SAF funding of "religious activities" in light of *Lemon*.[31]

1.

*Lemon*'s first prong focuses on the "purpose that animated" the Rector and Visitors' adoption of the SAF funding guidelines, *Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987), and asks whether that purpose was secular.

■ The obvious point of departure for analyzing the purpose of the guidelines is the Rector and Visitors' comments at the time of their adoption. Although the guidelines are the result of largely undocumented deliberations by the Rector and Visitors, and thus

cannot be said to possess a "legislative history" as that term usually is understood, they do contain a "Student Activity Fee Statement of Purpose" relevant to our deliberations. This statement reads:

The purpose of the student activity fee is to provide financial support for student organizations that are related to the educational purpose of the University of Virginia. As a required student fee, the monies collected by the University for funding student activities are public funds which must be administered in a manner consistent with the educational purpose of the University as well as with state and federal law.

The funding guidelines themselves, which immediately follow the "Student Activity Fee Statement of Purpose" and are part of the

2148 n. 7. We are bound to follow the decisions of the Supreme Court, not the pronouncements of a single Justice or even of a pair of Justices in dissent. As Justice Powell has stated,
the three-pronged *Lemon* test ... is the only coherent [Establishment Clause] test a majority of the Court has ever adopted.... *Lemon* has never been overruled or its test modified.
*Jaffree,* 472 U.S. at 64, 105 S.Ct. at 2494 (Powell, J., concurring) (footnote and citations omitted). For purposes of the Establishment Clause question presented here, therefore, we are bound to consider *Lemon* governing precedent.

**31.** We reject the plaintiffs' contention that the Supreme Court's decision in *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality opinion), controls our analysis of the Establishment Clause issue presented by this case, and obviates the need to examine the guidelines' restrictions in light of *Lemon v. Kurtzman. Texas Monthly* involved a state sales tax exemption for "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings sacred to a religious faith." *Texas Monthly,* 489 U.S. at 5, 109 S.Ct. at 894. The Court held that the exemption was insufficiently broad—that is, that it did not reach an adequately wide class of publications—to pass Establishment Clause scrutiny.

If *Texas Monthly* has application in the instant case, it is only as an extra pillar for our initial, but not dispositive, holding that the SAF guidelines' "religious activit[y]" prohibition has erected a presumptively unconstitutional prior restraint on the receipt of a government benefit. In his opinion for a three-Justice plurality, Justice Brennan stated:
[W]hen government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that

either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to free exercise of religion ..., it "provide[s] unjustifiable awards of assistance to religious organizations" and cannot but "conve[y] a message of endorsement" to slighted members of the community. This is particularly clear where, as here, the subsidy is targeted at writings that *promulgate* the teachings of religious faiths. *Id.* at 15, 109 S.Ct. at 899 (quoting *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 348, 107 S.Ct. 2862, 2874–75, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring in judgment)). As we explain below, an award of SAF funds to defray publication costs of *Wide Awake* would "convey a message of endorsement" of Christianity to non-Christian members of the University of Virginia community. "This is particularly clear," *id.,* because, as we observe, such a subsidy would be targeted at a publication whose purpose is "to encourage students to consider what a personal relationship with Jesus Christ means," *Wide Awake,* Nov.–Dec. 1990, at 2—a goal plainly contemplating the "promulgat[ion]" of Christian teachings.

That *Texas Monthly* supports one wing of our analysis does not, however, release us from the obligation of testing the Rector and Visitors' asserted state interest in complying with the Establishment Clause. Indeed, Justice Brennan's opinion addressed Texas's Establishment Clause defense of its sales tax exemption by holding that the exemption lacked sufficient breadth to pass scrutiny under *Lemon. See Texas Monthly,* 489 U.S. at 8–17, 109 S.Ct. at 895–901. Because this case involves a direct governmental subsidy of religious expression rather than a mere exemption from the payment of duties, it is not directly on point with *Texas Monthly.*

same document, were adopted by the Rector and Visitors in an attempt to give practical effect to the SAF's goal of providing financial support for student organizations related to the University's educational purpose. In the third section of the guidelines, titled "Student Expenditures and Activities Not Eligible for Funding," the Rector and Visitors proscribed funding of "religious activities" on the ground that such activities "do not relate to the educational purpose of the University."

These statements make clear that the Rector and Visitors' aim in denying SAF funding to "religious activities" was to comply with the University of Virginia's educational function—a facially secular legislative purpose.[32] Because religion is taught and studied as a subject of formal academic inquiry at the University, however, the plaintiffs contend that religious expression forms part of the institution's educational "purpose." They argue, therefore, that the University, already having admitted religious discussion formally into the academic curriculum, can have no stake in depriving such discussion of access to its coffers, even if the source of the discussion is a student organization.

We disagree. That religion is studied at the University does not mean that offering SAF funding to *Wide Awake* would promote the essentially secular "educational purpose" of the institution, or that such funding necessarily would not threaten the Establishment Clause. Since its founding by Thomas Jefferson in the second decade of the nineteenth century, the University's educational purpose has included teaching and scholarship on a wide array of subjects,[33] including the organized study of religious systems. As the plaintiffs note, while serving as Rector of the University Jefferson explained that no professorship of divinity had been established

"in conformity with the principles of [the] constitution, which place all sects of religion on an equal footing," but that arrangements would be made to allow various denominations to establish schools "on the confines of the University" and to allow them access to University facilities. 19 *The Writings of Thomas Jefferson* 408 (A. Bergh ed., 1905) (report to University Visitors dated Oct. 7, 1822). That such "schools" were incorporated into the University's intellectual and academic life does not prevent the Rector and Visitors from employing funding restrictions to advance the "secular purpose" of avoiding an establishment of religion at the institution.

As we see it, it is clear from the SAF's statement of purpose that the funding guidelines were motivated primarily, if not entirely, by a legitimate secular purpose—the advancement of the University of Virginia's educational mission. We do not question the propriety of, nor the secular motivation for, the Rector and Visitors' interest in preserving University funds for the institution's educational mission. The Rector and Visitors do not dispute that, on the whole, religious concerns were not the sole motivation behind the guidelines. *See Lynch v. Donnelly*, 465 U.S. 668, 680, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). The record gives us no reason to doubt that the Rector and Visitors' expressed purposes are "sincere and not a sham." *Id.* at 687, 104 S.Ct. at 1366. Therefore, we hold that the guidelines' proscription against funding of "religious activit[ies]" is not motivated wholly by an impermissible purpose, and does not offend the Establishment Clause.

2.

As is usual in Establishment Clause cases, *see, e.g., Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 383–98, 105 S.Ct. 3216, 3222–30,

---

**32.** *Cf., e.g., Bowen v. Kendrick,* 487 U.S. 589, 602–04, 108 S.Ct. 2562, 2570–72, 101 L.Ed.2d 520 (1988) (looking to "the face" of the Adolescent Family Life Act to determine whether federal grants in the area of premarital adolescent sexual relations and pregnancy authorized by the Act violate the Establishment Clause).

**33.** The Code of Virginia sets forth the "branches of learning to be taught" at the University as follows:

[T]he Latin, Greek, Hebrew, French, Spanish, Italian, German, and Anglo–Saxon languages; the different branches of mathematics, pure and physical; natural philosophy, chemistry, mineralogy, including geology; the principles of agriculture; botany, anatomy, surgery and medicine; zoology, history and ideology, general grammar, ethics, rhetoric, and belles lettres; civil government, political economy, the law of nature and of nations and municipal law.

Va.Code Ann. § 23–63 (1985 & Supp.1992).

87 L.Ed.2d 267 (1985), the more subtle question is whether the primary effect of the guidelines restrictions is to inhibit or advance religion. *See Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111.

Although we concluded above that the prohibition against funding "religious activities" denies religious *speech* the same access to the SAF accorded secular speech, and thus violates the Speech and Press Clause, whether "religion" is thereby inhibited or advanced is a different matter. The Rector and Visitors have not attempted to ban the publication of *Wide Awake;* indeed, they have supported its religious mission by allowing the members of Wide Awake Productions access to University meeting and printing facilities equal to that afforded all other CIOs. The University permits the plaintiffs to distribute *Wide Awake* on its grounds without limitation.

Notwithstanding its refusal to subsidize the journal directly, the University's sustenance of religion in these incidental respects does not, in our view, inhibit religion. The University's policy of allowing the members of Wide Awake Productions open access to campus facilities accords the plaintiffs ample opportunity to express their religious views, and leaves the University community as a whole free to read and consider them. The Rector and Visitors' funding policy simply declines to take the additional step of actively subscribing University funds to *Wide Awake*'s particular religious perspective. Under such circumstances as these, we are unpersuaded that the primary effect of the guidelines restrictions, involving as they do only the direct allocation of public monies, would be to inhibit religion.

On the other hand, it would be difficult to view awarding SAF monies to *Wide Awake* as anything but state sponsorship—and therefore advancement—of religious belief. As the Constitution of Wide Awake Productions attests, *Wide Awake* strives to challenge Christians to live according to the faith they espouse, and to encourage students at the University to consider "what a personal relationship with Jesus Christ means." *Wide Awake,* Nov.–Dec. 1990, at 2. The journal's contents—some of which are aimed at proselytizing non-Christians—have pursued these goals indefatigably throughout the three issues of *Wide Awake* represented in the record. Using public funds to support a publication so clearly engaged in the propagation of particular religious doctrines would constitute a patent Establishment Clause violation. In the words of Justice Powell:

> Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a *specifically religious activity* in an otherwise substantially secular setting.

*Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973) (emphasis added). Here, then, we hold that the primary effect of an SAF subsidy of *Wide Awake*'s publication costs would be to advance religion.

3.

It is the third of the three *Lemon* criteria—whether the guidelines' prohibition of funding for "religious activities" fosters an excessive government entanglement with religion—that is most plainly implicated by this case. *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111. The constitutional prohibition against excessive church-state entanglement reflects James Madison's concern that secular and religious authorities must not interfere with each other's respective spheres of choice and influence. *See* III Jonathan Elliott, *Debates on the Federal Constitution* 431–32, 729–31 (1891) (remarks of James Madison); *Illinois ex rel. McCollum v. Board of Educ.,* 333 U.S. 203, 212, 68 S.Ct. 461, 465–66, 92 L.Ed. 649 (1948).[34] The entanglement principle thus stems ultimately from fears, originally propounded by the First Amendment's principal framer, that church-state entanglement might strain the political system, compromise

---

**34.** *But see Wallace v. Jaffree,* 472 U.S. 38, 98–99, 105 S.Ct. 2479, 2511–2512, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (urging that Madison did not attempt to translate Jefferson's Virginia Statute for Religious Freedom into the religion clauses of the First Amendment, and criticizing earlier Supreme Court decisions for adopting this view).

liberty of conscience, and, ultimately, "destroy government and downgrade religion." *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1961); Laurence H. Tribe, *American Constitutional Law* § 14–11, at 1226 (2d ed. 1988) (summarizing the import of church-state entanglement).

The indirect and incidental conferral of a government benefit to religious institutions has never been thought a sufficient defect to warrant the invalidation of a state policy. *Zobrest v. Catalina Foothills Sch. Dist.,* —— U.S. ——, —— – ——, 113 S.Ct. 2462, 2466–69, 125 L.Ed.2d 1 (1993); *Widmar v. Vincent,* 454 U.S. 263, 274–75, 102 S.Ct. 269, 276–77, 70 L.Ed.2d 440 (1981); *Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 775, 93 S.Ct. 2955, 2966, 37 L.Ed.2d 948 (1973). Indeed, the Supreme Court has sanctioned awards of direct nonmonetary benefits to religious groups where government has created open fora to which all similarly situated organizations are invited. In *Widmar,* for example, the Court held that a state university which makes its facilities available to registered student groups may not deny equal access to a registered student group desiring to use those facilities for religious worship or discussion. 454 U.S. at 277, 102 S.Ct. at 278. Thus, although religious groups may directly benefit from access to university *facilities,* a state university may not discriminate against them based on the content of their speech.

Direct monetary subsidization of religious organizations and projects, however, is a beast of an entirely different color. A proper respect for the Establishment Clause compels the Rector and Visitors to pursue a course of "neutrality" toward religion. Yet providing SAF monies to defray the publication costs of *Wide Awake* inevitably would advance *Wide Awake*'s Christian mission: "to encourage students to consider what a personal relationship with Jesus Christ means." *Wide Awake,* Nov.–Dec. 1990, at 2. The potentially divisive political effect of such funding is a factor of recurring significance in the Supreme Court's jurisprudence surrounding *Lemon*'s "excessive entanglement" prong. As Justice Black emphasized in *Everson v. Board of Education,* 330 U.S. 1, 67

S.Ct. 504, 91 L.Ed. 711 (1947), competition among religious sects for political and religious supremacy has occasioned considerable civil strife throughout history, "generated in large part" by competing efforts to gain or maintain the support of government. *Id.* at 8–9, 67 S.Ct. at 507–509. As we see it, the "potential for political divisiveness related to religious belief and practice" would be aggravated if the University were to fund the publication of *Wide Awake.* The possibility of a continuing annual appropriation for the benefit of a single religion carries the potential for seriously divisive political consequences at the University of Virginia. The prospect of such divisiveness, as Justice Powell has admonished, is a "warning signal" the Rector and Visitors would ignore at their, and the University's, peril. *Nyquist,* 413 U.S. at 798, 93 S.Ct. at 2978.

Because *Wide Awake* is a journal pervasively devoted to the discussion and advancement of an avowedly Christian theological and personal philosophy, for the University to subsidize its publication would, we believe, send an unmistakably clear signal that the University of Virginia supports Christian values and wishes to promote the wide promulgation of such values. Since offering SAF funds to the members of Wide Awake Productions would excessively entangle the University of Virginia with the propagation of the Christian religion, we hold that the Rector and Visitors have proved the existence of a compelling state interest in complying with the Establishment Clause. This compelling interest justifies the Rector and Visitors' decision to promulgate guidelines excluding the membership of Wide Awake Productions from access to SAF monies.

E

It remains for us to consider whether the funding guidelines' proscription against "religious activities" is sufficiently circumscribed to survive the strictest judicial scrutiny.

The Supreme Court has held that a government policy is "narrowly tailored" if it "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988). If

the guidelines' "religious activities" proscription had a substantial deleterious effect on the ability of student organizations to engage in meaningful religious expression, the plaintiffs' contention that the proscription is not narrowly tailored might carry considerable force. Yet it is difficult for us to conceive how the Rector and Visitors may avoid offending the Establishment Clause without extending the prohibition on SAF funding to all "religious activities." Because the First Amendment forbids government to promulgate policies "respecting an establishment of religion," government is left no choice but to foreswear financial support of the myriad forms of religious endeavor in which a student organization might engage. Hence, we believe that the guidelines' declaration that student organizations involved in "religious activities" as that phrase is defined [35] is not "substantially broader than necessary" to achieve the Rector and Visitors' legitimate constitutional ends, *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984), and thus satisfies the requirement of narrow tailoring.

### F

In summary, we conclude that the Rector and Visitors' refusal to permit funding of "religious activities" places a presumptively unconstitutional condition upon access to government benefits in violation of the Free Speech and Press Clause of the First Amendment. We further conclude, however, that the Rector and Visitors have shown the existence of a compelling state interest in (1) foregoing funding awards that would have the primary effect of advancing religion at the University of Virginia, and (2) preserving the University of Virginia from an excessive entanglement with religion. Finally, the Rector and Visitors' restriction against funding "religious activities" is narrowly tailored to achieve this compelling state interest. Having survived the strictest judicial scrutiny, the funding restriction cannot be labelled constitutionally invalid under the Speech and Press Clause.

35. *See supra* note 2.

### IV

The district court rejected the plaintiffs' contention that the guidelines' proscription of funding for "religious activities" violates the Free Speech and Press Clause by excluding them from the "limited public forum" represented by the SAF. After careful and reasoned consideration of the governing precedents, *see Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983), the court concluded that the Rector and Visitors' systematic, purposeful exclusion of certain student groups from access to SAF funds indicated that the Rector and Visitors intended the SAF to be a nonpublic forum. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 795 F.Supp. 175, 178–81 (W.D.Va.1992) (mem.)

We agree that the Rector and Visitors have not created a limited public forum by awarding SAF funds only to those student organizations which, in the view of University authorities, advance the institution's essentially secular educational mission although we do so for a different reason. As laid out in part III, *supra*, we believe that the proper analysis of this case lies under the line of authority dealing with content-based discrimination relating to government-generated benefits or burdens. The long line of public forum cases have taken "forum" in a fairly literalistic way involving physical space, and we do not see how it advances the jurisprudence to wrench that word out of its accepted form to encompass this type of case already subject to First Amendment scrutiny.

### V

We finally turn to the plaintiffs' contention that the guidelines' prohibition against funding of "religious activities" discriminates against them in contravention of the Equal Protection Clause of the Fourteenth Amendment (1) by denying them benefits which other CIOs engaged in religious speech and activities have received, and (2) because the restrictions serve no compelling state inter-

est, and are not narrowly tailored to satisfy whatever interest the Rector and Visitors may have in denying funding to "religious activit[ies]."

## A

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. The plaintiffs contend that the Rector and Visitors have infringed their rights under the Equal Protection Clause by awarding SAF monies to the Muslim Students Association, the Jewish Law Students Association, and the C.S. Lewis Society while denying funding to Wide Awake Productions.

To establish an equal protection violation, a plaintiff must show discriminatory intent as well as disparate effect. *See Crawford v. Board of Educ.*, 458 U.S. 527, 544, 102 S.Ct. 3211, 3221, 73 L.Ed.2d 948 (1982); *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1355 (4th Cir.1989), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990). Upon careful review of the summary judgment record, the district court found no evidence to indicate that the University's denial of SAF funding to Wide Awake Productions was the product of discriminatory intent. Because this finding is not contested by the plaintiffs on appeal, we are constrained to hold that the district court's factual findings on the point are not tainted with clear error. Moreover, the plaintiffs' failure to argue the existence of discriminatory intent as a matter of law on appeal deprives us of jurisdiction to consider the merits of their equal protection claim, and compels us to affirm the district court's decision to grant summary judgment in favor of the Rector and Visitors.

## B

For the reasons stated in part III, *supra*, we already have held that the Rector and Visitors' refusal to fund "religious activities" serves the compelling state interest of preserving the University of Virginia from an excessive entanglement with religion, and is narrowly tailored to achieve that interest. We therefore need not consider this question again for purposes of the Fourteenth Amendment. The Rector and Visitors' stake in avoiding an excessive entanglement with religion is equally strong in all constitutional contexts, including that of the Equal Protection Clause, if, as we hold, no prima facie violation of the plaintiffs' equal protection rights exists. This assignment of error therefore warrants no further discussion.

## VI

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED.*